# CITY OF HARTFORD *v.* HARTFORD MUNICIPAL EMPLOYEES ASSOCIATION ET AL.
## (SC 16507)
## (SC 16508)

Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued November 1, 2001—officially released January 29, 2002

*Lisa S. Lazarek*, assistant general counsel, for the appellant in Docket No. SC 16507 (defendant state board of labor relations).

*Stephen F. McEleney*, with whom, on the brief, were *Richard P. Lawlor* and *Joanne Heslin Laverty*, for the appellant in Docket No. SC 16508 (named defendant).

*Ivan A. Ramos*, assistant corporation counsel, for the appellee (plaintiff).

*Opinion*

KATZ, J. This appeal raises several issues of first impression regarding the authority of the state board of labor relations to interpret and enforce grievance settlements pursuant to the Municipal Employees Relations Act (act). The defendants, the Hartford Municipal

Employees Association (union) and the state board of labor relations (board), appeal[1] from the trial court's judgment sustaining the appeal by the plaintiff, the city of Hartford (city),[2] from the board's decision determining that the city had committed an unfair labor practice by "refusing to comply with a grievance settlement" in violation of General Statutes § 7-470 (a) (6) of the act.[3] On appeal, the defendants claim that the trial court improperly concluded that: (1) a "grievance settlement" does not encompass an unappealed step two grievance decision; (2) § 7-470 (a) (6) only requires compliance with a grievance settlement with respect to the specific circumstances giving rise to the dispute and not to future disputes arising from the same provision in the collective bargaining agreement (agreement), despite the parties' clearly expressed intent that the settlement have future application; and (3) the board is barred, under the doctrine of exhaustion of remedies, from exercising its jurisdiction over claims arising under § 7-470 (a) (6) until a grievance has proceeded through arbitration or has been abandoned.[4] We conclude that

[1] The defendants appealed from the trial court's judgment to the Appellate Court. Subsequently, pursuant to Practice Book § 65-2 and General Statutes § 51-199 (c), we granted the board's motion to transfer the appeal to this court.

[2] The city is a municipal employer within the meaning of the act. General Statutes § 7-467 (1) defines a municipal employer as "any political subdivision of the state, including any town, city, borough, district, district department of health, school board, housing authority or other authority established by law, a private nonprofit corporation which has a valid contract with any town, city, borough or district to extinguish fires and to protect its inhabitants from loss by fire, and any person or persons designated by the municipal employer to act in its interest in dealing with municipal employees . . . ."

[3] General Statutes § 7-470 (a) provides in relevant part: "Municipal employers or their representatives or agents are prohibited from . . . (6) refusing to comply with a grievance settlement, or arbitration settlement, or a valid award or decision of an arbitration panel or arbitrator rendered in accordance with the provisions of section 7-472."

[4] In addition to challenging the three errors of law assigned by the trial court to the board's decision, the union claims that the trial court improperly failed to give due deference to the board. This claim is implicated in our

the board properly exercised jurisdiction and properly determined that the city had committed a prohibited practice in violation of § 7-470 (a) (6). Accordingly, we reverse the judgment of the trial court.

The record discloses the following relevant facts and procedural history. The city has instituted personnel rules that are incorporated by reference into its agreement with the union. Personnel rule X sets forth normal working hours for city employees as 8:30 a.m. to 4:30 p.m. with an unpaid hour for lunch, for a total of seven work hours per day. Personnel rule IV, however, establishes that certain employees, including those employees at the level of civil engineer I and higher, are entitled to work a "flexible" schedule.

Prior to May, 1997, employees classified as civil engineer III had been permitted to alter their schedules in two different ways: (1) they could shift the beginning and ending time of their workday while still working a total of seven hours in one day; or (2) they could work less than seven hours in one day and work additional hours on other days to compensate for the lost time to meet the required thirty-five hour total work week. In some instances, the employees sought permission before changing their schedule; on other occasions, they merely informed their supervisor of the change. On May 28, 1997, John Bertoli and Richard St. Pierre, city employees with job classifications of civil engineer III in the city's department of public works, were told by their supervisor that they no longer would be permitted to work flexible schedules. Bertoli and St. Pierre filed a grievance that same day, alleging a violation of the agreement and the city's personnel rules with regard to the flexible schedule policy. The adjustment required

_____

analysis of the trial court's interpretation of the statute in contravention of the board's interpretation and, therefore, we need not address it as a separate claim.

to remedy the violation, according to the grievance statement, was for the city to adhere to the flexible schedule provisions in the personnel rules and the agreement.

On July 1, 1997, subsequent to a hearing, the city's representative, Kathleen Morey, a principal administrative analyst, rendered a step two decision on the grievance filed by Bertoli and St. Pierre pursuant to the agreement.[5] Morey determined that the grievance presented two distinct issues: hours of work and flexible schedules. With respect to the first issue, Morey concluded that the agreement required employees to work from 8:30 a.m. to 4:30 p.m., and that any permanent change to such hours required prior written approval. Therefore, she denied that part of the grievance. With respect to the second issue, flexible schedules, Morey first determined that, under the agreement, employees at the level of civil engineer I and higher were entitled

---

[5] The agreement between the city and the union provides for the resolution of grievances pursuant to the following procedure: "Any grievance or dispute which may arise between the parties concerning the application, meaning or interpretation of this Agreement, unless specifically excluded by this Agreement, shall be settled in the following manner:

"Step 1. The aggrieved employee, who may be represented by a representative of the [union], shall present the facts to his immediate supervisor . . . [who] shall render his decision . . . within 10 working days . . . .

"Step 2. If the grievance is not resolved in Step 1, the employee or the [union] representative shall reduce the grievance to writing and present it within 10 working days to the department head. . . . The department head shall arrange a meeting with all parties concerned present, to review the facts and shall notify the employee and the [union] representative of his or her decision in writing within 10 working days. . . .

"Step 3. If the grievance is not resolved in Step 2, the employee or the [union] representative shall present it to the Director of Personnel within 10 working days. . . . If requested by the employee or the [union], or if he or she so determines, the Director of Personnel . . . shall meet informally with the interested parties . . . and, in any case, shall render his or her decision in writing within 15 working days. . . .

"Step 4. If the [union] is not satisfied with the decision rendered in Step 3, it shall notify the Director of Personnel in writing within 10 working days . . . that it intends to submit the grievance to arbitration. . . ."

to work flexible schedules. As a result, she concluded that "this grievance is sustained, in part, with regard to working flexible schedules. However, it is appropriate that all employees who work a flexible schedule have prior approval from their designated supervisor/manager *before* any adjustment to the [seven] hour work day is made." (Emphasis in original.) Neither the union nor the employees appealed the decision.

Several months later, Bertoli submitted a request asking for his regular schedule to be changed to 8 a.m. to 4 p.m. The acting director of public works denied the request, noting that his decision was consistent with the 1997 step two grievance decision. The union then filed a complaint with the board alleging that the city's conduct with respect to Bertoli had violated § 7-470 (a) (6) by refusing to comply with a grievance settlement.[6] See footnote 3 of this opinion. In July, 1998, while the complaint was pending before the board, Husein Osman, another civil engineer III, was issued a written reprimand after beginning work at 8 a.m. and leaving at 4 p.m. without first receiving permission from his supervisor. Osman filed a grievance, which was denied at steps one through three of the grievance procedure as set forth in the agreement. The union tendered notice to the city, pursuant to step four of the grievance procedure, that it intended to submit the grievance to binding arbitration. Thereafter, the union also amended its unfair practice complaint to the board to include the city's conduct with respect to Osman.

At a hearing conducted by the board in accordance with § 7-471 (5),[7] the city argued that the board should

[6] In addition, the union alleged that the city had committed an unfair practice by unilaterally changing Bertoli's work hours as well as by unilaterally requiring employees to get permission prior to changing the number of hours worked per day in violation of the contract. The board concluded that the city did not violate the act by either action. The union did not appeal the board's decision with respect to these claims.

[7] General Statutes § 7-471 provides in relevant part: "The State Board of Labor Relations shall have the following power and authority in relation to

## dismiss the complaint for lack of jurisdiction. Specifi-

collective bargaining in municipal employment . . .

"(5) Whenever a question arises as to whether a practice prohibited by sections 7-467 to 7-477, inclusive, has been committed by a municipal employer or employee organization, the board shall consider that question in accordance with the following procedure: (A) When a complaint has been made to the board that a prohibited practice has been or is being committed, the board shall refer such complaint to its agent. Upon receiving a report from the agent, the board may issue an order dismissing the complaint or may order a further investigation or a hearing thereon. When a hearing is ordered, the board shall set the time and place for the hearing, which time and place may be changed by the board at the request of one of the parties for cause shown. Any complaint may be amended with the permission of the board. The municipal employer, the employee organization and the person so complained of shall have the right to file an answer to the original or amended complaint within five days after the service of such complaint or within such other time as the board may limit. Such municipal employer, such employee organization and such person shall have the right to appear in person or otherwise to defend against such complaint. In the discretion of the board any person may be allowed to intervene in such proceeding. In any hearing the board shall not be bound by the technical rules of evidence prevailing in the courts. A transcript of the testimony taken at any hearing before the board shall be filed with the board. (B) If, upon all the testimony, the board determines that a prohibited practice has been or is being committed, it shall state its findings of fact and shall issue and cause to be served on the party committing the prohibited practice an order requiring it or him to cease and desist from such prohibited practice, and shall take such further affirmative action as will effectuate the policies of sections 7-467 to 7-477, inclusive, including but not limited to: (i) Withdrawal of certification of an employee organization established or assisted by any action defined in said sections as a prohibited practice, (ii) reinstatement of an employee discriminated against in violation of said sections with or without back pay, or (iii) if either party is found to have refused to bargain collectively in good faith, ordering arbitration and directing the party found to have refused to bargain to pay the full costs of arbitration under section 7-473c, resulting from the negotiations in which the refusal to bargain occurred. (C) If, upon all of the testimony, the board determines that a prohibited practice has not been or is not being committed, it shall state its finding of fact and shall issue an order dismissing the complaint. (D) For the purposes of hearings and enforcement of orders under sections 7-467 to 7-477, inclusive, the board shall have the same power and authority as it has in sections 31-107, 31-108 and 31-109, and the municipal employer and the employee organization shall have the right of appeal as provided therein. (E) If, by the thirtieth day following the date on which a complaint citing a violation of section 7-470 was made to the board, said board has not determined whether a prohibited practice has been or is being committed and if the violation is

cally, the city argued that the union was barred, under the doctrine of res judicata and the board's own deferral policy,[8] from bringing an unfair practice claim that would require the board to interpret the same contract provision at issue in the step two grievance decision when the union had failed to appeal from that decision. The board rejected that argument in light of the fact that the union's claim was predicated on its interpretation that the grievance decision sustained its position. The board further noted that it would be inappropriate to dismiss the claim since the union had not discovered that the city's interpretation was contrary to its own until several months after it had accepted the grievance decision, at which point the union could no longer appeal the grievance decision to arbitration.

Turning to the merits, the board agreed with the union that the step two grievance decision interpreted the city's personnel rules as entitling employees to change occasionally their start and end times of work without permission, as long as employees worked a seven hour day. The board examined the portion of the decision that provided that "it is appropriate that all employees who work a flexible schedule have prior approval . . . *before* any adjustment to the [seven] hour work day is made"; (emphasis in original); and concluded that it meant that permission was required when an employee wanted to work more or less than seven hours in one

---

of an ongoing nature, said board may issue and cause to be served on the party committing the act or practice cited in such complaint an order requiring such party to cease and desist from such act or practice until said board has made its determination."

[8] The city argued that the board was required to dismiss based on its decision in *In re New London*, Conn. Board of Labor Relations Decision No. 2443 (November 7, 1995), aff'd sub nom. *Local 1378, Council 4, AFSCME, AFL-CIO* v. *Board of Labor Relations*, Superior Court, judicial district of Hartford-New Britain at Manchester, Docket No. CV850313031S (July 14, 1987) (applying doctrine of res judicata and deferral as grounds for dismissal of unfair practice complaint).

day. Consequently, the board concluded that "the [c]ity violated the [a]ct when it failed to abide by the 1997 grievance settlement by requiring employees to get approval before occasionally flexing the start and end times of their workday." The board ordered the city to comply with the 1997 grievance decision and to rescind Osman's written reprimand.

Thereafter, the city appealed from the board's decision to the Superior Court pursuant to General Statutes § 4-183 (a).[9] The city claimed that the board's decision was arbitrary and an abuse of discretion because it was contrary to the personnel rules and because the board had failed to credit certain testimony presented to it. The city also claimed that the board exceeded its statutory authority by exercising jurisdiction over a matter of contract interpretation while the Osman grievance was pending before the state board of mediation and arbitration.

At a hearing on the matter, the trial court, sua sponte, raised the issue of whether § 7-470 (a) (6), which proscribes the refusal to comply with a "grievance settlement," protects only the original parties to the settlement, or whether it also applies prospectively to parties not part of the original settlement. Pursuant to the trial court's order, the parties submitted supplemental briefs on the issue, focusing in particular on the legislative history of § 7-470 (a) (6). The city, however, raised a different issue in its brief.[10] Specifically, it contended that the legislative history indicated that a step

---

[9] General Statutes § 4-183 (a) provides in relevant part: "A person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision may appeal to the Superior Court as provided in this section. . . ."

[10] The board filed a motion for leave to file a reply brief to address the issue raised in the city's posthearing brief. The board also contended that the trial court should disregard the issue raised in the city's brief, on the ground that it was nonresponsive to the question raised by the court. The trial court granted the city's request to file a reply brief.

two grievance decision cannot be a per se grievance settlement within the meaning of § 7-470 (a) (6). Instead, according to the city, a settlement exists where the parties reach an agreement as a result of a grievance decision. As the parties in the present case had different interpretations of the decision, the city contended that there was no agreement and, hence, no settlement.

The trial court sustained the city's appeal. The trial court first concluded that the board improperly had determined that the city had committed a prohibited practice. The trial court's conclusion rested on two principles: (1) that the board incorrectly had interpreted the statutory term "grievance settlement" to include a step two grievance decision; and (2) that the board improperly had determined that the grievance settlement extended beyond the original parties to the dispute and applied prospectively to include the city's conduct with respect to Osman. Finally, the trial court concluded that the board was barred, under the doctrine of exhaustion of remedies, from exercising jurisdiction over any claim related to Osman's grievance while that grievance was pending before the state board of mediation and arbitration. The union and the board appealed from the trial court's judgment.

I

General Statutes § 7-470 (a) (6) makes it a prohibited practice for a municipal employer[11] to "refus[e] to comply with a grievance settlement, or arbitration settlement, or a valid award or decision of an arbitration panel or arbitrator rendered in accordance with the provisions of section 7-472."[12] The first two issues in

[11] Section 7-470 (b) imposes an identical prohibition on employee organizations.

[12] General Statutes § 7-472 provides: "Mediation by State Board of Mediation and Arbitration. (a) The services of the State Board of Mediation and Arbitration shall be available to municipal employers and employee organizations for purposes of mediation of grievances or impasses in contract or contract reopener negotiations and for purposes of arbitration of disputes

this appeal turn on whether the board correctly interpreted the term "grievance settlement." Consequently, we first set forth the well established standard of judicial review that we apply when reviewing an agency's interpretation and application of a statute.

"[A]n agency's factual and discretionary determinations are to be accorded considerable weight by the courts. . . . Cases that present pure questions of law, however, invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion." (Internal quotation marks omitted.) *Connecticut Light & Power Co.* v. *Texas-Ohio Power, Inc.*, 243 Conn. 635, 642, 708 A.2d 202 (1998); *MacDermid, Inc.* v. *Dept. of Environmental Protection*, 257 Conn. 128, 137, 778 A.2d 7 (2001). We have determined, therefore, that the traditional deference accorded to an agency's interpretation of a statutory term is unwarranted when "the construction of a statute . . . has not previously been subjected to judicial scrutiny [or to] . . . a governmental

over the interpretation or application of the terms of a written agreement and, if such service is requested by both the municipal employer and the employee organization except as provided in section 7-473c for purposes of arbitration of impasses in contract or contract reopener negotiations. Whenever any impasse in contract or contract reopener negotiations is submitted to arbitration, the decision of the arbitration panel or arbitrator shall be rendered no later than twenty days prior to the final date by which time the budget-appropriating authority of the municipality is required to adopt its budget or forty days after the close of the arbitration hearing, whichever is later, provided that in no case except when such arbitration service is requested or mandated after the final budget adoption date shall such decision be rendered later than five days prior to such final budget adoption date. Nothing contained herein shall prevent any agreement from being entered into in accordance with the provisions of subsection (e) of section 7-474.

"(b) Nothing in this section is intended to prevent the use of other arbitration tribunals in the resolution of disputes over the interpretation or application of the terms of written agreements between municipal employers and employee organizations."

agency's time-tested interpretation . . . ." (Internal quotation marks omitted.) *Connecticut Assn. of Not-for-Profit Providers for the Aging* v. *Dept. of Social Services*, 244 Conn. 378, 390, 709 A.2d 1116 (1998); accord *Office of Consumer Counsel* v. *Dept. of Public Utility Control*, 252 Conn. 115, 121, 742 A.2d 1257 (2000) (government agency's reasonable, time-tested interpretation " 'should be accorded great weight by the courts' "); *State Medical Society* v. *Board of Examiners in Podiatry*, 208 Conn. 709, 719, 546 A.2d 830 (1988) ("deference to . . . time-tested agency interpretation of a statute, but only when the agency has consistently followed its construction over a long period of time, the statutory language is ambiguous, and the agency's interpretation is reasonable").[13] Consequently, an agency's interpretation of a statute is accorded deference when the agency's interpretation has been formally articulated and applied for an extended period of time, and that interpretation is reasonable.[14] Cf. *Con-*

---

[13] To the extent that this court's prior decisions could be read to limit further such deference to only those circumstances in which the statute has been subject to judicial review, we reject such an interpretation. First, we note that the records in those cases do not indicate that the agency consistently had applied, over an extended period of time, a particular statutory interpretation. See, e.g., *MacDermid, Inc.* v. *Dept. of Environmental Protection*, supra, 257 Conn. 128; *Starr* v. *Commissioner of Environmental Protection*, 236 Conn. 722, 736, 675 A.2d 430 (1996). Second, such an interpretation would be inconsistent with our reasoning in *Office of Consumer Counsel* v. *Dept. of Public Utility Control*, supra, 252 Conn. 121, wherein we determined that plenary review should be applied only after noting that the issue of law had not been time-tested by the department or previously considered by the courts.

[14] We note that such deference is warranted because a time-tested interpretation, like judicial review, provides an opportunity for aggrieved parties to contest that interpretation. Moreover, in certain circumstances, the legislature's failure to make changes to a long-standing agency interpretation implies its acquiescence to the agency's construction of the statute. Compare *Connecticut Assn. of Not-for-Profit Providers for the Aging* v. *Dept. of Social Services*, supra, 244 Conn. 390 n.18 (legislative inaction not pertinent in light of lack of formal declaration of interpretation by agency), with *Jolly, Inc.* v. *Zoning Board of Appeals*, 237 Conn. 184, 200–201, 676 A.2d 831

*necticut Assn. of Not-for-Profit Providers for the Aging*
v. *Dept. of Social Services*, supra, 390 n.18 (finding
no deference warranted to agency interpretation when
agency had failed to make public declaration of inter-
pretation and had applied interpretation for only four
years).

## A

The first issue is whether the term "grievance settle-
ment" within § 7-470 (a) (6) encompasses an unap-
pealed grievance decision such that the city's failure to
comply with the 1997 step two grievance decision would
constitute a prohibited practice.[15] "We approach this
question according to well established principles of stat-
utory construction designed to further our fundamental
objective of ascertaining and giving effect to the appar-
ent intent of the legislature. . . . In seeking to discern
that intent, we look to the words of the statute itself,
to the legislative history and circumstances surrounding
its enactment, [and] to the legislative policy it was
designed to implement . . . ." (Internal quotation
marks omitted.) *Williams* v. *Commission on Human
Rights & Opportunities*, 257 Conn. 258, 270, 777 A.2d
645 (2001).

"As with any issue of statutory interpretation, our
initial guide is the language of the statute itself." (Inter-
nal quotation marks omitted.) Id. Subsection (a) (6)
was added to § 7-470 as part of a 1975 amendment to
the act. See Public Acts 1975, No. 75-189, §§ 1, 2. The
term grievance settlement is not defined in the act or

(1996) (determining that legislative inaction was compelling consideration
in determining whether to overrule prior interpretation).

[15] Normally, we would begin our analysis with the jurisdictional claim.
See, e.g., *Conetta* v. *Stamford*, 246 Conn. 281, 289, 715 A.2d 756 (1998); *Hall*
v. *Gilbert & Bennett Mfg. Co.*, 241 Conn. 282, 289, 695 A.2d 1051 (1997).
Because we conclude that the exhaustion of remedies doctrine is not a bar
to the board's jurisdiction over claims arising under § 7-470 (a) (6); see part
II of this opinion; we begin with the primary issue of statutory construction.

the State Labor Relations Act, General Statutes § 31-101 et seq. In the absence of express statutory guidance, we normally "construe words used in statutes and regulations according to their commonly approved usage." *Commission on Human Rights & Opportunities* v. *Windsor Hall Rest Home*, 232 Conn. 181, 196, 653 A.2d 181 (1995); *Carr* v. *Bridgewater*, 224 Conn. 44, 56–57, 616 A.2d 257 (1992). The trial court, in reliance upon this general rule, concluded that the word "settlement" has a clear meaning that is distinguishable from a "decision." It noted that a settlement is defined as "an agreement ending a dispute or lawsuit," while a decision is "a judicial determination after consideration of the facts and law." The defendants contend that the trial court overlooked the clear and unequivocal meaning ascribed to the term grievance settlement in the context of labor law. Specifically, they claim that the term long has been understood to encompass the resolution of a dispute at any step in the grievance process agreed upon by the parties pursuant to their collective bargaining agreement.

We depart from the general rule construing statutory terms according to common usage when a word or phrase has either a technical meaning or is a legal term of art. General Statutes § 1-1 (a);[16] *Commission on Human Rights & Opportunities* v. *Windsor Hall Rest Home*, supra, 232 Conn. 196. In the labor law context in particular, words are often considered terms of art, as they embody certain policy considerations. See, e.g., *Charles D. Bonanno Linen Service* v. *National Labor Relations Board*, 454 U.S. 404, 425, 102 S. Ct. 720, 70 L. Ed. 2d 656 (1982) (Burger, C. J., dissenting)

---

[16] General Statutes § 1-1 (a) provides: "In the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language; and technical words and phrases, and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly."

(" '[i]mpasse' is a term of art in labor law; the presence of an impasse triggers other important consequences"); *Assn. of American Railroads* v. *Surface Transportation Board*, 161 F.3d 58, 64 (D.C. Cir. 1998) (" '[l]abor protection' is a recognized term of art in the railroad industry"); *Communications Workers of America, AFL-CIO* v. *Southwestern Bell Telephone Co.*, 713 F.2d 1118, 1122 (5th Cir. 1983) (" 'intent to terminate' " is term of art in labor field); *Ruzicka* v. *General Motors Corp.*, 707 F.2d 259, 260 (6th Cir.), cert. denied, 464 U.S. 982, 104 S. Ct. 424, 78 L. Ed. 2d 359 (1983) (" 'past practice' " is labor law term of art); *Board of Education* v. *State Board of Labor Relations*, 217 Conn. 110, 120, 584 A.2d 1172 (1991) (" 'duty to bargain in good faith' " is term of art in labor law). We conclude that the term "grievance settlement" is such a term of art and should be construed according to its well established meaning in the labor law context.

At the time that the legislature amended § 7-470 to make it a prohibited practice for an employer to refuse to comply with a grievance settlement; see Public Acts 1975, No. 75-189, §§ 1, 2; the grievance-arbitration process was well recognized as a fundamental cornerstone to the bargaining process, promoting an important goal underlying both state and federal labor policy. *John Wiley & Sons, Inc.* v. *Livingston*, 376 U.S. 543, 549, 84 S. Ct. 909, 11 L. Ed. 2d 898 (1964); *United Steelworkers of America* v. *Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578, 80 S. Ct. 1347, 4 L. Ed. 2d 1409 (1960); *Colt's Industrial Union* v. *Colt's Mfg. Co.*, 137 Conn. 305, 309, 77 A.2d 301 (1950). The process "promotes the goal of industrial peace by providing a means for labor and management to settle disputes through negotiation rather than industrial strife. See *John Wiley & Sons, Inc.* [v. *Livingston*, supra, 549]. Adoption of a grievance procedure provides the parties with a means of giving content to the collective-bargaining agreement and

determining their rights and obligations under it. See [*United Steelworkers of America* v.] *Warrior & Gulf Navigation Co.,* [supra, 581]." *Bowen* v. *United States Postal Service,* 459 U.S. 212, 225, 103 S. Ct. 558, 74 L. Ed. 2d 402 (1983); see also *West Hartford Education Assn., Inc.* v. *DeCourcy,* 162 Conn. 566, 588, 295 A.2d 526 (1972) (noting that grievance procedure provides "an amicable and efficient means of resolving any differences within a contract previously acceptable to and executed by the parties").

The federal labor law in effect at the time the legislature added subsection (a) (6) to § 7-470 indicates that the term grievance settlement was understood to encompass a grievance decision rendered pursuant to the procedures set forth in the parties' contract. Section 203 (d) of the Labor Management Relations Act of 1947, 61 Stat. 154, 29 U.S.C. § 173 (d), provides: "Final adjustment *by a method agreed upon by the parties* is hereby declared to be the desirable method *for settlement of grievance disputes* arising over the application or interpretation of an existing collective-bargaining agreement. . . ." (Emphasis added.) Moreover, the United States Supreme Court and this court long have underscored that the grievance procedure is the "uniform and exclusive method for [the] orderly *settlement* of employee grievances . . . ." (Emphasis added; internal quotation marks omitted.) *Bowen* v. *United States Postal Service,* supra, 459 U.S. 226; *Republic Steel Corp.* v. *Maddox,* 379 U.S. 650, 653, 85 S. Ct. 614, 13 L. Ed. 2d 580 (1965); *Hunt* v. *Prior,* 236 Conn. 421, 431–32, 673 A.2d 514 (1996); *School Administrators Assn.* v. *Dow,* 200 Conn. 376, 382, 511 A.2d 1012 (1986).

The United States Supreme Court has further stated that the goal of promoting industrial peace through the use of the grievance process "can be effectuated only if the means chosen by the parties for settlement of their differences under a collective bargaining agreement is

given full play." *United Steelworkers of America* v. *American Mfg. Co.*, 363 U.S. 564, 566, 80 S. Ct. 1343, 4 L. Ed. 2d 1403 (1960). Consequently, "[i]n providing for a grievance and arbitration procedure . . . the employer and the union contemplate that each will endeavor in good faith *to settle grievances short of arbitration.* Through this settlement process, frivolous grievances are ended prior to the most costly and time-consuming step in the grievance procedures." (Emphasis added.) *Vaca* v. *Sipes*, 386 U.S. 171, 191, 87 S. Ct. 903, 17 L. Ed. 2d 842 (1967). Consistent with this view, Connecticut courts have noted that "[t]he collective bargaining agreement provides a multistep grievance procedure, including both informal and formal sessions, through which to resolve disputes." *Waterbury Teachers Assn.* v. *Freedom of Information Commission*, 42 Conn. App. 700, 709, 682 A.2d 125 (1996), rev'd on other grounds, 240 Conn. 835, 694 A.2d 1241 (1997). "The goal throughout *each level* of the grievance procedure *is to reach a settlement* between the parties." (Emphasis added.) Id., 711; accord *International Union of Automobile, Aerospace & Agricultural Implement Workers of America* v. *Fafnir Bearing Co.*, 151 Conn. 650, 651–52, 201 A.2d 656 (1964) (grievance referred to arbitration after it was processed through three steps of grievance procedure without "settlement"). It seems evident, therefore, that the term grievance settlement has been understood to encompass decisions rendered prior to arbitration if made pursuant to the steps set forth in the contract between the parties.

Indeed, the contract at issue in the present case reflects the parties' own understanding that a grievance decision "settles" a dispute. That agreement provides that "[a]ny grievance or dispute which may arise between the parties concerning the application, meaning or interpretation of this Agreement, unless specifically excluded by this Agreement, *shall be settled* in

the following manner . . . ." (Emphasis added.) The agreement then sets forth a four step process for the resolution of grievances. See footnote 5 of this opinion. The parties proceed to the subsequent step of the process only when the grievance is not resolved by a decision rendered at the prior step.

Moreover, should any ambiguity remain as to the meaning of grievance settlement, that ambiguity is resolved by the board's time-tested and reasonable interpretation. See *Office of Consumer Counsel* v. *Dept. of Public Utility Control*, supra, 252 Conn. 121; *Connecticut Assn. of Not-for-Profit Providers for the Aging* v. *Dept. of Social Services*, supra, 244 Conn. 390. The board consistently has interpreted the statute for more than twenty-five years to encompass unappealed decisions rendered during the course of the grievance process. See, e.g., *In re East Hartford*, Conn. Board of Labor Relations Decision No. 1439 (September 3, 1976), enforced sub nom. *State Board of Labor Relations* v. *East Hartford*, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CV214657 (May 12, 1978) (finding that failure to comply with step two grievance decision when employer withdrew its request for arbitration violated act); *In re Seymour*, Conn. Board of Labor Relations Decision No. 2068 (July 15, 1981) (concluding that valid settlement of union's grievance, triggering protections of act, was reached by board of police commission when it voted to uphold grievance in step two of grievance process); *In re Bridgeport*, Conn. Board of Labor Relations Decision No. 2140 (July 28, 1982) (employer's failure to comply with step two grievance decision violated act); *In re Bridgeport*, Conn. Board of Labor Relations Decision No. 2343-A (February 1, 1985) (refusal to comply with step one grievance decision violated act); *In re Hamden*, Conn. Board of Labor Relations Decision No. 2575 (August 3, 1987) (same); *In re New Haven*, Conn. Board

of Labor Relations Decision No. 3060 (December 24, 1992) (same). Although the board's interpretation was not directly at issue upon judicial review, it has been implicitly endorsed by the lower courts. See *State Board of Labor Relations* v. *East Hartford,* supra, Superior Court, Docket No. CV214657 (enforcing board decision ordering town to comply with step two grievance decision); *Stamford* v. *State Board of Labor Relations,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CV930131199, 1994 WL 774753 (September 19, 1994) (affirming board decision determining that city was bound by mayor's step two grievance decision pursuant to act).

In 1998, the board was faced squarely with the issue now confronting this court. See *In re Waterbury,* Conn. Board of Labor Relations Decision No. 3593 (April 21, 1998). In that case, the police union and three police officers filed a grievance claiming that the city had violated the collective bargaining agreement by failing to fill certain job vacancies in compliance with the time frame imposed by the agreement. Id. In step two of the grievance process, the mayor sustained the grievance and ordered the city to pay back pay to the officers. No appeal was taken from the step two decision. The union later filed an unfair practice complaint when the city refused to pay overtime with the back pay. The city contended before the board "that [§] 7-470 (a) (6) of the [a]ct does not apply to the facts of this case because the [s]tep [two] resolution is neither a 'settlement agreement,' 'arbitration settlement,' nor a 'valid award or decision of an arbitration panel,' as these terms are used in the statute." Id. The board disagreed, noting that it "ha[s] held that the term 'grievance settlement,' as used in the statute, encompasses *any resolution of a grievance at any step in the process.*" (Emphasis added.) Id. The board explained that "[t]he final nature of unappealed grievance resolutions is rec-

ognized by this [b]oard as not only typical, but essential to a system whose utility depends on the speed and the finality of its informal procedures." Id. We conclude that the board's time-tested interpretation of the statutory term is reasonable and consistent with its use as a term of art in the labor law context. Therefore, we defer to its reasonable interpretation. *Office of Consumer Counsel* v. *Dept. of Public Utility Control*, supra, 252 Conn. 121; *Marone* v. *Waterbury*, 244 Conn. 1, 9, 707 A.2d 725 (1998).

The city contends that, nonetheless, its step two decision is not a settlement that triggers the protections of the act because the plain language of the statute indicates the legislature's intention to distinguish between a grievance decision and a grievance settlement. Specifically, it relies on the fact that § 7-470 (a) (6) prohibits both refusals to comply with "a grievance *settlement* . . . or arbitration *settlement*" as well as "a valid award or *decision* of an arbitration panel . . . ." (Emphasis added.) The city contends that the legislature's failure to use the term "grievance decision" must be interpreted as a deliberate omission in light of its use of the word decision in conjunction with arbitration. We find no merit to this argument. As we previously have explained, the term grievance settlement is understood in the labor law context to encompass grievance decisions. We see no reason, therefore, for the legislature to have made such a distinction.

Finally, we find nothing in the legislative history to undermine the conclusion that the legislature did not intend to give the term grievance settlement its usual meaning in the labor law context. The floor debates in the House of Representatives at the time the bill was introduced reveal that the legislature's primary purpose was to provide a less costly and more expeditious manner in which to ensure enforcement of the grievance process than litigation. The bill's sponsor, Representa-

tive Dominic J. Badolato, explained: "The bill does nothing more than attempt to keep the parties honest in their dealings with each other. It allows the parties to go to the [board] for relief, and that's what the [board] is for . . . for the parties to seek relief. The individuals involved . . . both the . . . employer . . . and the employee organization involved would have less expense going to the [board] than they would if they had to go to the Courts. . . . It's expensive as . . . anyone could imagine. So that really the full thrust of this is to allow the parties to seek relief and nothing more than relief from the [board] and force the parties to comply with the settlement of a grievance, or an arbitrator's award, and nothing more than that." 18 H.R. Proc., Pt. 4, 1975 Sess., pp. 1755–56; see also id., p. 1750, remarks of Representative Joseph S. Coatsworth. The only opposition to the bill appears to have focused on whether the bill would in fact expedite the process or whether it would create greater expense by requiring the hiring of additional arbitrators. The following week, when the amended version of the bill came up for a vote,[17] the lone comment made prior to the unanimous vote in support of the bill reiterated the purpose as stated by Representative Badolato.[18]

There was no discussion during the House debates related to the substance of the unfair practice except for the following comment made by Representative Badolato: "What this bill addresses itself to is . . . that area where the parties meet, discuss the grievance,

---

[17] See part I B of this opinion for a discussion of the changes from the original bill introduced in the House of Representatives to the one that ultimately was enacted.

[18] Representative Joseph Bogdan stated in support of the bill: "[B]asically, one of the problems with the present legislation is that a party has no recourse but to go to the expense of litigation in order to get an enforcement. This would permit a shorter process and a less expensive process in the event that a party, one or the other party, fails to comply with an arbitration or grievance award." 18 H.R. Proc., Pt. 5, 1975 Sess., p. 2067.

arrive at an agreement, and then after arriving at an agreement, one side or the other reneges . . . refuses to abide by that agreement." Id., pp. 1754–55. We find nothing in this comment that is inconsistent with our previous discussion regarding the meaning of the term grievance settlement. The typical grievance procedure prior to the arbitration stage, like the step two decision in the present case, involves a step in which the parties meet, discuss the grievance and come to an agreement.[19] That agreement is reached when the employer's representative tenders its decision and the employee or the union representative accept that decision by not making a timely appeal to the next step.

The trial court, however, cited this isolated comment and then concluded that the legislature intended to distinguish between grievance decisions and grievance settlements. We can only surmise from this conclusion that the trial court interpreted this comment to mean that the failure to adhere to an informal agreement reached outside the confines of the grievance process, as defined in the bargaining agreement, would constitute an unfair practice, while a failure to adhere to a decision made according to the terms of the agreement would not. We reject this interpretation, however, because it directly contravenes the important labor policy of supporting the peaceful resolution of grievances through the means collectively agreed upon by the parties. See *Tedesco* v. *Stamford*, 222 Conn. 233, 244, 610 A.2d 574 (1992) (underscoring "societal interest in an orderly and efficient system of dispute resolution . . . in the form of union grievance procedures set forth in a collective bargaining agreement, with benefits inuring to both employer and employee"); see also *School*

---

[19] For example, in the grievance process in the present case, at step two, the department head arranges a meeting with all the parties concerned to review the facts. At step three, the director of personnel meets informally with the interested parties.

*Administrators Assn.* v. *Dow,* supra, 200 Conn. 381 (" 'not only permissible but desirable' for grievances between employees . . . and the employer . . . to be settled through the contract grievance-arbitration procedures").

The city offers yet another interpretation of Representative Badolato's comment. It contends that his repeated use of the word "agreement" means that a grievance decision cannot be a per se grievance settlement. Instead, the critical question, according to the city, is whether the parties have reached an agreement. The city contends that because the parties in the present case had different interpretations as to the meaning of part of the grievance decision, there was no meeting of the minds and, hence, no settlement or agreement. We reject this argument.

We first note that implicit in the city's argument is the concession that, under some circumstances, a grievance decision is equivalent to a grievance settlement for purposes of the statute. Our interpretation of a statutory term, however, cannot rest on whether the parties at some undetermined date later discover that they have ascribed a different meaning to some provision in the grievance decision. The mutual assent relevant to the grievance process takes place when the parties collectively bargain as to the mechanisms by which they resolve their disputes. The disputes are then resolved according to those terms. The realization by the parties at a later date that they have ascribed different meanings to a provision in the settlement does not negate the fact that a settlement already has occurred.[20] When

---

[20] This view is consistent with principles of contract interpretation. Where a dispute arises over contract interpretation, the resolution begins with the meanings attached by the parties at the time the contract was made, not at the time of the dispute. See 2 E. Farnsworth, Contracts (2d Ed. 1998) § 7.9, p. 262. Then, "if the parties attached different meanings to [the] language, the court's task is the more complex one of applying a standard of reasonableness to determine which party's intention is to be carried out at the expense of the other's." Id., p. 274; see also *Ginsberg* v. *Mascia,* 149 Conn. 502, 506,

such a disagreement arises, the board exercises its power, pursuant to its statutory authority to enforce grievance settlements; see General Statutes § 7-470; to determine the meaning of the settlement.[21] If we were to accept the city's interpretation, an employer could avoid its obligations pursuant to the collective bargaining agreement simply by feigning disagreement with the interpretation of a settlement term after the time has passed for the union to appeal the decision to arbitration. This would be, in our view, an untenable result. See *Southington* v. *Commercial Union Ins. Co.*, 254 Conn. 348, 360, 757 A.2d 549 (2000) ("[w]e ordinarily read statutes with common sense and so as not to yield bizarre results"); *Commission on Human Rights & Opportunities* v. *Sullivan Associates*, 250 Conn. 763, 778, 739 A.2d 238 (1999) (same); *Maciejewski* v. *West Hartford*, 194 Conn. 139, 151–52, 480 A.2d 519 (1984) (same).

In sum, there is nothing in the plain language of the statute, its legislative history, or the policy considerations underlying the statute that contravenes the board's interpretation of the term grievance settlement within § 7-470 (a) (6). Consequently, the trial court improperly failed to give due deference to the board's time-tested interpretation of the statute it is charged with enforcing. Cf. *Starr* v. *Commissioner of Environmental Protection*, supra, 226 Conn. 376 (trial court failed to give due deference to commissioner of environ-

---

182 A.2d 4 (1962) ("[t]he question is not what intention existed in the minds of the parties but what intention is expressed in the language used"); *Foley* v. *Foley*, 149 Conn. 469, 471, 181 A.2d 607 (1962) (same); *Sturtevant* v. *Sturtevant*, 146 Conn. 644, 647, 153 A.2d 828 (1959) (same).

[21] We note that a party is not without recourse should it disagree with the board's interpretation. The party may appeal from that decision to the Superior Court and prevail upon a showing that the decision is not supported by substantial evidence. See General Statutes § 4-183 (a) and (j). The city had challenged the board's interpretation in its appeal in the trial court, but does not raise that issue in its appeal to this court.

mental protection's construction of statute). We conclude, therefore, that an unappealed grievance decision that was rendered pursuant to the procedures agreed upon by the parties would settle a dispute and, thus, trigger the protections of the act.

B

The second issue is whether a grievance settlement can limit the employer's conduct only with respect to the original parties to the settlement and not prospectively to other persons. The trial court concluded that, because Osman was not a party to the 1997 grievance, the board improperly determined that the city had committed an unfair practice by reprimanding him for flexing his schedule in contravention to the 1997 step two grievance decision. The defendants claim that when a grievance settlement clearly indicates the parties' intention that it has future application, the employer violates § 7-470 when it refuses to comply with the settlement with respect to future disputes arising from the same contract provision. We agree with the defendants.

As we noted previously, the board has the power to interpret grievance settlements pursuant to its statutory authority to enforce the settlements. See General Statutes §§ 7-470 and 7-471 (5). For some time, the board has interpreted grievance settlements to have prospective application upon a determination that the parties have objectively expressed such an intention.[22] Compare *In re Hartford*, Conn. Board of Labor Relations Decision

---

[22] The board has noted: "In our prior decisions concerning § 7-470 (a) (6) of the Act, we have consistently held that when a party charges that there has been a refusal to comply with a grievance settlement or arbitration award, we will interpret the settlement or award to ascertain what it requires. This is an objective standard . . . . The [board] will not examine the merits of the underlying grievance complaint nor the parties' intentions or goals in the formulation of the settlement. . . . The [b]oard's analysis only looks to the language of the settlement." (Citations omitted.) *In re Waterbury*, Conn. Board of Labor Relations Decision No. 3593 (April 21, 1998).

No. 3503 (May 9, 1997) (failure to abide by settlement violated act when police officer not party to original grievance was not treated in compliance with settlement decision), *In re Hartford*, Conn. Board of Labor Relations Decision No. 3421 (July 11, 1996) (board noted in dicta that if different facts had been present, employer conduct toward officer not party to original settlement would have violated act), *In re New Haven*, Conn. Board of Labor Relations Decision No. 3060 (December 24, 1992) (grievance agreement construed to apply to employees generally within scope of agreement where union brought initial grievance) and *In re Seymour*, Conn. Board of Labor Relations Decision No. 2068 (July 15, 1981) (union filed grievance that determined rights of class of employees), with *In re Waterbury*, Conn. Board of Labor Relations Decision No. 2665 (August 30, 1988) (board looked to scope of grievance and postsettlement conduct to determine grievance limited by parties to circumstances at one location) and *In re Rocky Hill*, Conn. Board of Labor Relations Decision No. 2050 (June 12, 1981) (town's action of conducting survey of sick leave use and of issuing warning notices to suspected abusers did not constitute failure to comply with prior grievance settlement where such actions not specifically covered by prior settlements; no evidence that settlement intended to cover more than specific grievance of individual officer). To make such a determination, the board looks at the grievance itself, the problem it was designed to resolve, and the express language of the settlement. See *In re Waterbury*, supra, Conn. Board of Labor Relations Decision No. 2665; *In re Waterbury*, Conn. Board of Labor Relations Decision No. 2287 (March 8, 1984); see also *West Haven Police Local 895* v. *State Board of Labor Relations*, Superior Court, judicial district of New Haven, Docket No. 246595 (October 17, 1986) (noting that in ascertaining meaning of grievance settlement,

board must consider language of agreement and circumstances surrounding its making). In the present case, the board determined that the parties objectively demonstrated an intention to resolve the issue of flexible schedules with respect to all employees with job classifications of civil engineer I and higher.

By giving effect to the parties' agreement, the board plays an important role in ensuring the stability of management and labor relations. That role can best be understood by reflecting on how the grievance process would be impacted if settlements were per se limited to the parties to the dispute. We first note that, for all intents and purposes, the "parties" to a dispute are always the same—the employer and the union.[23] Consequently, the employer and the union would be forced to revisit the same issue of contract interpretation time and time again, regardless of their intentions to the contrary. Moreover, an employer could make conflicting contract interpretations in subsequent settlements. See *Stratford* v. *International Assn. of Firefighters, AFL-CIO, Local 998*, 248 Conn. 108, 728 A.2d 1063 (1999) (arbitrators may make different interpretations of contract provision since they are not bound by collateral estoppel). Not only would this result exacerbate labor and management relations, but it would also run contrary to the statute's purpose of creating a more efficient means to resolve grievances. See *Vaca* v. *Sipes*, supra, 386 U.S. 191.

[23] We recognize that an employee may bring a grievance on his or her own without union representation, as there is no statutory requirement to have such representation. In fact, General Statutes § 7-468 (c) expressly provides: "An individual employee at any time may present a grievance to his employer and have the grievance adjusted, without intervention of an employee organization, provided the adjustment shall not be inconsistent with the terms of a collective bargaining agreement then in effect. The employee organization certified or recognized as the exclusive representative shall be given prompt notice of the adjustment." We also are aware that this situation occurs infrequently.

Nonetheless, the trial court concluded that such a result was required in light of the statute's legislative history. A bill concerning prohibited practices under the act was introduced in the House of Representatives on April 23, 1975, at which time the House members debated its merits. This version prohibited an employer from "refusing to comply with an agreement to settle a grievance or a decision or award of an arbitration panel or arbitrator rendered under section 7-472 *within thirty days after such grievance settlement was reached or such arbitration award rendered, unless the state board of labor relations finds, in accordance with the procedure established in subdivision (4) of section 7-471, that one or more conditions exist which would be a basis for vacating or correcting an arbitration award under section 52-418 or 52-419.*" (Emphasis added.) Substitute House Bill No. 6925, 1975 Sess. The actual vote on the bill came six days later, when Representative Joseph Bogdan moved for acceptance of the joint committee's favorable report and passage of the bill after summarizing an amended version of the bill. Substitute House Bill No. 6925, as amended by House Amendment Schedule A; 18 H.R. Proc., Pt. 5, 1975 Sess., pp. 2066–67. His statement echoed the purposes as stated originally by Representative Badolato; see footnote 17 of this opinion and accompanying text; and made no mention of any changes to the bill. The primary change to the bill was the deletion of the thirty day compliance period. The House chairperson ruled that the changes reflected in House Amendment A were technical in nature and the bill passed unanimously without any debate. Id., p. 2067. Thereafter, the Senate also passed the bill without debate. 18 S. Proc., Pt. 4, 1975 Sess., p. 1580.

The trial court reasoned that because the amendment was ruled technical, it "must be deemed not to have changed the substance of the bill nor the intent of the

House in passing the bill as amended. By the bill providing that a prohibited labor practice was refusing to comply with a grievance settlement or arbitration award within thirty days of the settlement or award, it was clearly referring to the resolution of the particular dispute giving rise to the grievance, and not to refusing to comply with a previous grievance disposition." The trial court did acknowledge, however, that "there may be a tiny uncertainty as to whether, by adopting the amendment, the legislature intended to make a prohibited labor practice the refusal to abide by the precedent of a previous grievance disposition in a case involving other parties."

We agree with the trial court that, because the amendment was ruled technical, we should not ascribe any substantive change to the bill as enacted. See *Pollio* v. *Planning Commission*, 232 Conn. 44, 55, 652 A.2d 1026 (1995) ("[t]echnical amendments are not generally intended to effect substantive changes in the law"); see also *Vaillancourt* v. *New Britain Machine/Litton*, 224 Conn. 382, 390, 393–94, 618 A.2d 1340 (1993); *Thomas E. Golden Realty Co.* v. *Society for Savings*, 31 Conn. App. 575, 579 n.2, 626 A.2d 788 (1993). We disagree, however, that the thirty day provision has any relevance to the question of whether the legislature intended grievance settlements to have prospective application.[24]

[24] A likely rationale for the original inclusion of the thirty day time limit is offered by the defendants. They contend that the provision was an effort to reconcile a party's obligation to comply with an arbitration award with its statutory right to apply for an order in the Superior Court to have the award vacated or corrected. The version of the bill as first introduced in the House of Representatives permitted a party to defend against an unfair practice complaint if it could prove "that one or more conditions exist which would be a basis for vacating or correcting an arbitration award under section 52-418 or 52-419." Substitute House Bill No. 6925. Because a party is required to bring such an application within thirty days from the notice of an arbitration award; see General Statutes § 52-420 (b); the defendants contend that the substitute bill merely provided a mechanism to stay enforcement until the application period expired.

The plain language of the provision simply set forth a grace period before an unfair practice could accrue; it did not place any limitations on which persons would be entitled to file a complaint once that grace period had expired. Thus, regardless of its inclusion or deletion in the final bill, it would not impact the question before this court.

Consequently, nothing in the legislative history contravenes the strong policy considerations that support the board's interpretation of the statute. As such, we conclude that it is an unfair practice to fail to comply with a grievance settlement with respect to subsequent disputes arising from the same contract provision when the parties to the settlement clearly had expressed an intention in the settlement that it have future application. The trial court, therefore, improperly concluded that the board erred when it determined that the city had committed an unfair practice by refusing to comply with the grievance settlement with respect to its conduct toward Osman.

## II

The final issue is whether the board is required, under the doctrine of exhaustion of administrative remedies, to withhold its jurisdiction over claims arising under § 7-470 (a) (6) until a grievance has proceeded through arbitration or has been abandoned. The trial court determined that the board was barred from exercising jurisdiction over a claim related to the Osman grievance because that grievance was pending before the state board of arbitration and mediation.[25] We conclude that

[25] We conclude that, despite a statement by the trial court that its decision was predicated on the board's "error of law" and not its lack of jurisdiction, the trial court's decision rested on jurisdictional grounds. The trial court first discussed the exhaustion of remedies doctrine, determined that the rule should apply by analogy, and then concluded that because "it makes sense [in the present case] for the entire grievance procedure provided for in the [agreement] between the parties to be followed before a litigant can invoke the [board] to determine that a prohibited labor practice has been committed . . . this court so holds." We further note that there is no indica-

the doctrine of exhaustion of remedies is inapplicable to the board's review of such claims.

"The doctrine of exhaustion of administrative remedies is well established in the jurisprudence of administrative law. . . . The doctrine provides that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted. . . . *McKart* v. *United States*, 395 U.S. 185, 193, 89 S. Ct. 1657, 23 L. Ed. 2d 194 (1969)." (Internal quotation marks omitted.) *Johnson* v. *Statewide Grievance Committee*, 248 Conn. 87, 95, 726 A.2d 1154 (1999). "Where a statutory requirement of exhaustion is not explicit, courts are guided by [legislative] intent in determining whether application of the doctrine would be consistent with the statutory scheme." (Internal quotation marks omitted.) Id., 96; accord *McCarthy* v. *Madigan*, 503 U.S. 140, 144, 112 S. Ct. 1081, 117 L. Ed. 2d 291 (1992). "Consequently, [t]he requirement of exhaustion may arise from explicit statutory language or from an administrative scheme providing for agency relief. . . . *Howell* v. *Immigration & Naturalization Service*, 72 F.3d 288, 291 (2d Cir. 1995) . . . ." (Citation omitted; internal quotation marks omitted.) *Johnson* v. *Statewide Grievance Committee*, supra, 97.

A primary purpose of the doctrine is to foster "an orderly process of administrative adjudication and judicial review, offering a reviewing court the benefit of the agency's findings and conclusions. It relieves courts of the burden of prematurely deciding questions that, entrusted to an agency, may receive a satisfactory administrative disposition and avoid the need for judicial review." (Internal quotation marks omitted.) *Shortt* v. *New Milford Police Dept.*, 212 Conn. 294, 306 n.10, 562

tion that the trial court predicated its decision on the board's failure to defer to the arbitration proceeding as it failed to cite a single deferral case, despite a plethora of such cases.

A.2d 7 (1989); accord *Johnson* v. *Statewide Grievance Committee,* supra, 248 Conn. 95. Moreover, "the exhaustion doctrine recognizes the notion, grounded in deference to [the legislature's] delegation of authority to coordinate branches of Government, that agencies, not the courts, ought to have primary responsibility for the programs that [the legislature] has charged them to administer." *McCarthy* v. *Madigan,* supra, 503 U.S. 145; accord *Cannata* v. *Dept. of Environmental Protection,* 215 Conn. 616, 625, 577 A.2d 1017 (1990). Therefore, exhaustion of remedies serves dual functions: it protects the courts from becoming unnecessarily burdened with administrative appeals and it ensures the integrity of the agency's role in administering its statutory responsibilities.

We note as an initial matter that there is no statutory requirement that an employee exhaust grievance procedures prior to initiating a prohibited practice complaint. The only statutory requirement applies to the exhaustion of administrative remedies within an agency. General Statutes § 4-183 (a); see footnote 9 of this opinion. We also fail to see how the dual functions of exhaustion of remedies are served by requiring the board to withhold jurisdiction pending the exhaustion of grievance and arbitral remedies. In the present case, it is the agency's jurisdiction that is at issue, not the trial court's jurisdiction. Thus, the burden on the court system is unaffected by the application of the doctrine. In addition, imposing a per se exhaustion requirement could only thwart the board's efforts to fulfill its statutory charge to remedy unfair labor practices.

We are aware, however, of an additional policy consideration that is implicated when the exhaustion doctrine is considered in the context of grievance-arbitration proceedings. Because of the importance of promoting the "orderly settlement of grievances" by the method chosen by the parties, "[i]t is well settled

under both federal and state law that, before resort to the courts is allowed, an employee must at least attempt to exhaust exclusive grievance and arbitration procedures, such as those contained in the collective bargaining agreement . . . . Failure to exhaust the grievance procedures deprives the court of subject matter jurisdiction. . . . The purpose of the exhaustion requirement is to encourage the use of grievance procedures, rather than the courts, for settling disputes." (Citation omitted; internal quotation marks omitted.) *Hunt* v. *Prior*, supra, 236 Conn. 431–32; accord *Vaca* v. *Sipes*, supra, 386 U.S. 184; *Republican Steel Corp.* v. *Maddox*, supra, 379 U.S. 652. A contrary rule "would inevitably exert a disruptive influence upon both the negotiation and administration of collective [bargaining] agreements." *Local 174, Teamsters, Chauffeurs, Warehousemen & Helpers of America* v. *Lucas Flour Co.*, 369 U.S. 95, 103, 82 S. Ct 571, 7 L. Ed. 2d 593 (1962); *Hunt* v. *Prior*, supra, 432.

In the present case, however, we conclude that such concerns over the disruption to the grievance process are inapposite. There is no statutory requirement that an unfair practice proceeding supplant a pending arbitral proceeding. Thus, unlike in the case of judicial review, a grievance or arbitral proceeding may exist coextensively with the board's jurisdiction over an unfair practice complaint. Cf. *Norwich* v. *Norwich Fire Fighters*, 173 Conn. 210, 216, 377 A.2d 290 (1977) (noting that union's decision to seek relief from board of mediation and arbitration from city's unilateral decision to terminate certain pension rights did not preclude union from taking legal or other action). The primary reason for this distinction is the fact that the state board of mediation and arbitration and the state board of labor relations each have its "own field of operation." *Local 1219, International Assn. of Fire Fighters* v. *Connecticut Labor Relations Board*, 171 Conn. 342, 354, 370 A.2d

952 (1976) (concluding that board properly dismissed plaintiff's unfair practice complaint despite earlier arbitration award in favor of plaintiff); *L. Suzio Construction Co.* v. *State Board of Labor Relations*, 148 Conn. 135, 168 A.2d 553 (1961) (concluding that action of arbitration and mediation board did not bar board of labor relations' consideration of unfair practice claim). The authority to arbitrate or settle a grievance is strictly limited by the terms of the collective bargaining agreement and the submission by the parties. *Genovese* v. *Gallo Wine Merchants, Inc.*, 226 Conn. 475, 485–86, 628 A.2d 946 (1993). The grievance or arbitration proceeding, therefore, is "concerned with the contract and not with statutes. . . . If . . . the contract does not require the arbitrators to apply legal standards, arbitrators are not required to decide according to law." (Citation omitted; internal quotation marks omitted.) *Local 1219, International Assn. of Fire Fighters* v. *Connecticut Labor Relations Board*, supra, 354–55. By contrast, the board is charged with determining whether an unfair practice, as defined by statute, has been committed and with remedying any violations. General Statutes § 4-471 (5). Consistent with this distinction, we have held that "an employee who does not exhaust the grievance procedures established in a collective bargaining agreement may pursue a cause of action in the Superior Court if the cause of action is premised on an independent statutory claim." *Genovese* v. *Gallo Wine Merchants, Inc.*, supra, 481; see also *Wright* v. *Universal Maritime Service Corp.*, 525 U.S. 70, 78, 119 S. Ct. 391, 142 L. Ed. 2d 361 (1998) (concluding that plaintiff was not required first to arbitrate claim arising under Americans with Disabilities Act as it was not dependent upon interpretation of collective bargaining agreement).

We recognize that in some unfair practice claims, the distinction between the role of the arbitrator and the board can become somewhat obscure. This problem

becomes especially acute when the claim is the failure to comply with a prior grievance settlement that has interpreted a contract provision. We conclude, however, that the board has instituted appropriate safeguards to ensure that its jurisdiction does not unduly interfere with the grievance and arbitration procedures negotiated by the parties.

The board has adopted two deferral policies as originally articulated by the National Labor Relations Board: postarbitral deferral and prearbitral deferral.[26] See *In re Orange*, Conn. Board of Labor Relations Decision No. 1581 (October 3, 1977) (approving postarbitral deferral policy of *Spielberg Mfg. Co.*, 112 N.L.R.B. 1080 [1955], and prearbitral deferral policy of *Collyer Insulated Wire*, 192 N.L.R.B. 837 [1971]).[27] The National Labor Relations Board has explained that, "an industrial relations dispute may involve conduct which, at least arguably, may contravene both the collective agreement and our statute. When the parties have contractually committed themselves to mutually agreeable procedures for resolving their disputes during the period of the contract, we are of the view that those procedures should be afforded full opportunity to function. . . . We believe it to be consistent with the fundamental objectives of Federal law to require the parties . . .

---

[26] The board has adopted these policies pursuant to its discretionary authority to implement the policies of the labor relations acts, rather than pursuant to statute. See, e.g., 5 Ill. Comp. Stat. 315/11 (i) (Sup. 2001), which provides: "If an unfair labor practice charge involves the interpretation or application of a collective bargaining agreement and said agreement contains a grievance procedure with binding arbitration as its terminal step, the Board may defer the resolution of such dispute to the grievance and arbitration procedure contained in said agreement."

[27] The board has noted, however, that its application of the deferral policies follow the doctrines as originally articulated by the National Labor Relations Board rather than the "complex and sometimes inconsistent rulings of the [National Labor Relations Board] involving the *Collyer* [*Insulated Wire* (prearbitral deferral)] and *Spielberg* [*Mfg. Co.* (postarbitral deferral)] doctrines." *In re Orange*, supra, Conn. Board of Labor Relations Decision No. 1581.

to honor their contractual obligations rather than, by casting [their] dispute in statutory terms, to ignore their agreed-upon procedures." (Citations omitted.) *Collyer Insulated Wire,* supra, 842–43. To address these concerns, under the postarbitral deferral policy, the board generally defers to an arbitral award when: (1) the unfair practice had been presented to and considered · by the arbitral tribunal; (2) the arbitral proceedings were fair and regular; (3) all parties had agreed to be bound by the arbitral award; and (4) the award is not repugnant to the purposes and policies of the labor relations statutes.[28] *In re Orange,* supra, Conn. Board of Labor Relations Decision No. 1581; *In re Wallingford,* Conn. Board of Labor Relations Decision No. 2885 (February 6, 1991); see also *Local 1378, Council 4, AFSCME, AFL-CIO* v. *State Board of Labor Relations,* Superior Court, judicial district of Hartford-New Britain at Manchester, Docket No. CV850313031S (July 14, 1987). Under its prearbitral deferral policy, the board likewise may defer when a party has invoked the grievance-arbitration procedure but has not taken the dispute to arbitration.[29] Compare *In re New London,* Conn. Board

---

[28] The board has articulated certain exceptions to its deferral policy, such as when arbitration is not binding; *In re Windsor Board of Education,* Conn. Board of Labor Relations Decision No. 1644 (May 9, 1978); or "where the grievance-arbitration procedure is probably not available to the complainant . . . interpretation of the contract is not necessary to determine whether a statutory violation has occurred . . . [or] the employer's unilateral action is designed to undermine the union or its claim of contractual privilege is patently erroneous." (Citation omitted.) *In re Orange,* supra, Conn. Board of Labor Relations Decision No. 1581, citing *In re Norwich (Fire),* Conn. Board of Labor Relations Decision No. 1239 (June 24, 1974).

[29] "[I]f a grievance previously had been filed challenging the same employer action challenged by the prohibited practice complaint, and the union [has] failed to bring the grievance to binding arbitration after denial of the grievance on the merits, the union will be barred from challenging the employer's interpretation of the contract if: [1] the issue of contract interpretation determinative of the grievance is the same issue of contract interpretation that would be determinative of the prohibited practice case; and [2] the grievance proceedings were fair and regular; and [3] the parties have agreed to be bound by [the] grievance settlements; and [4] to apply such a bar would not be repugnant to the purposes and policies of the Act." *In re New*

of Labor Relations Decision No. 2443 (November 7, 1985), aff'd, *Local 1378, Council 4, AFSCME, AFL-CIO* v. *State Board of Labor Relations*, supra, Superior Court, Docket No. CV850313031S (deferral to unappealed step two grievance appropriate), with *In re Bristol*, Conn. Board of Labor Relations Decision No. 3235 (August 22, 1994) (deferral to step two grievance inappropriate since statutory issue does not require contract interpretation). Should the board decide that deferral is appropriate while an arbitration process is pending, it holds the unfair practice complaint "in abeyance pending the result of arbitration so that upon motion it may review the arbitration award to determine whether it is consistent with the purposes and policies of the Act." *In re Orange*, supra, Conn. Board of Labor Relations Decision No. 1581. The board's decision either to defer or to refuse to defer may be reviewed for an abuse of discretion pursuant to § 4-183 (j) (6).[30]

We conclude that these deferral policies offer sufficient safeguards for the integrity of the dispute resolution procedures agreed upon by the parties to obviate the need for this court to impose a requirement that the parties exhaust these procedures prior to pursuing an unfair practice claim before the board. Cf. *National Labor Relations Board* v. *City Disposal Systems, Inc.*, 465 U.S. 822, 838–39, 104 S. Ct. 1505, 79 L. Ed. 2d 839 (1984) (decision by National Labor Relations Board to protect individual action as concerted activity under doctrine enunciated in *Interboro Contractors, Inc.*, 157

*London*, Conn. Board of Labor Relations Decision No. 2443 (November 7, 1985).

[30] General Statutes § 4-183 (j) provides in relevant part: "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are . . . (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. . . ."

N.L.R.B. 1295 [1966], enforced, *National Labor Relations Board* v. *Interboro Contractors, Inc.*, 388 F.2d 495 [2d Cir. 1967], *does* not undermine arbitration procedures in part because board may defer to those procedures). Therefore, the trial court in the present case improperly concluded that the board was barred from exercising jurisdiction while the Osman grievance was pending before the state board of arbitration and mediation.

The judgment is reversed and the case is remanded with direction to dismiss the appeal.

In this opinion the other justices concurred.