# SOUTHERN NEW ENGLAND TELEPHONE COMPANY
## *v.* DEPARTMENT OF PUBLIC UTILITY CONTROL
## (SC 16539)

Sullivan, C. J., and Katz, Palmer, Vertefeuille and Zarella, Js.

1

Argued March 22—officially released July 23, 2002

*Ralph G. Elliot*, with whom was *Michael C. D'Agostino*, for the appellant (plaintiff).

*Tatiana D. Eirmann*, assistant attorney general, with whom, on the brief, was *Richard Blumenthal*, attorney general, for the appellee (defendant).

*Robert P. Dolian,* with whom, on the brief, were *Robert J. Sickinger* and *Juliet Bonazolli,* for the appellee (intervening defendant MCI WorldCom, Inc.).

*Everett E. Newton,* with whom was *Jennifer D. Janelle,* for the appellee (intervening defendant CTC Communications Corporation).

*Opinion*

KATZ, J. The plaintiff, Southern New England Telephone Company, appeals[1] from the trial court's judgment dismissing its appeal from the decision of the defendant, the department of public utilities control (department), ordering the plaintiff to file a proposed tariff for certain enhanced provisioning services (enhanced services), which the plaintiff offers to competitive local exchange carriers (competing carriers), that is consistent with prior department rate setting guidelines and to impose the same charges for such services on the plaintiff's own retail customers. The plaintiff claims[2] that the trial court improperly deter-

---

[1] The plaintiff appealed from the trial court's judgment to the Appellate Court. We then transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

[2] We note that, although the plaintiff has framed the issues in its brief as jurisdictional, throughout its discussion of those issues it treats the claims as raising questions of authority, specifically, whether the department exceeded its statutory authority by setting rates. As we explained in *Amodio* v. *Amodio,* 247 Conn. 724, 727–28, 724 A.2d 1084 (1999), the issue of subject matter jurisdiction is distinct from the authority to act under a particular statute. "Subject matter jurisdiction involves the authority of a court to adjudicate the type of controversy presented by the action before it. . . . A court does not truly lack subject matter jurisdiction if it has competence to entertain the action before it. . . . Although related, the court's authority to act pursuant to a statute is different from its subject matter jurisdiction. The power of the court to hear and determine, which is implicit in jurisdiction, is not to be confused with the way in which that power must be exercised in order to comply with the terms of the statute." (Citations omitted; internal quotation marks omitted.) Id. Therefore, in an effort to ensure that we have adjudicated adequately the plaintiff's claims, we have reframed the issues into distinct claims addressing the department's subject matter jurisdiction to adjudicate the claims before it as well as its authority to act pursuant to the relevant statutes.

mined that: (1) the department properly had exercised jurisdiction under state law, pursuant to General Statutes §§ 16-247b (a)[3] and 16-247f (a),[4] and under federal law, pursuant to 47 U.S.C. §§ 251 (c) (3)[5] and 252 (d) (1) (Sup. 1999),[6] over the petition by competing carriers

[3] General Statutes § 16-247b provides in relevant part: "(a) On petition or its own motion, the department shall initiate a proceeding to unbundle a telephone company's network, services and functions that are used to provide telecommunications services and which the department determines, after notice and hearing, are in the public interest, are consistent with federal law and are technically feasible of being tariffed and offered separately or in combinations. Any telecommunications services, functions and unbundled network elements and any combination thereof shall be offered under tariff at rates, terms and conditions that do not unreasonably discriminate among actual and potential users and actual and potential providers of such local network services.

"(b) Each telephone company shall provide reasonable nondiscriminatory access and pricing to all telecommunications services, functions and unbundled network elements and any combination thereof necessary to provide telecommunications services to customers. The department shall determine the rates that a telephone company charges for telecommunications services, functions and unbundled network elements and any combination thereof, that are necessary for the provision of telecommunications services. The rates for interconnection and unbundled network elements and any combination thereof shall be based on their respective forward looking long-run incremental costs, and shall be consistent with the provisions of 47 USC 252(d). . . ."

[4] General Statutes § 16-247f (a) provides: "The department shall regulate the provision of telecommunications services in the state in a manner designed to foster competition and protect the public interest."

[5] Title 47 of the United States Code, § 251 (c) (Sup. 1999), provides in relevant part: "In addition to the duties contained in subsection (b) of this section, each incumbent local exchange carrier has the following duties . . .

"(3) Unbundled access

"The duty to provide, to any requesting telecommunications carrier for the provision of a telecommunications service, nondiscriminatory access to network elements on an unbundled basis at any technically feasible point on rates, terms, and conditions that are just, reasonable, and nondiscriminatory in accordance with the terms and conditions of the agreement and the requirements of this section and section 252 of this title. An incumbent local exchange carrier shall provide such unbundled network elements in a manner that allows requesting carriers to combine such elements in order to provide such telecommunications service."

[6] Title 47 of the United States Code, § 252 (d) (Sup. 1999), provides in relevant part: "Pricing standards

claiming that the plaintiff charged the carriers excessive and discriminatory rates for the enhanced services; and (2) the department had not set rates and, accordingly, had not exceeded its statutory authority by ordering the plaintiff to submit the tariff, despite the fact that the department had rejected the competing carriers' claim that the enhanced services were "necessary" within the meaning of § 16-247b (b).[7] We affirm the judgment of the trial court.

The record contains the following relevant facts and procedural history. The department is a state agency authorized pursuant to title 16 of the General Statutes and the federal Telecommunications Act of 1996 (1996 federal act); 47 U.S.C. § 151 et seq. (Sup. 1999); to regulate and supervise the operation of public service companies in Connecticut. The plaintiff is a public service company within the meaning of General Statutes § 16-1 (a) (4) and (23)[8] and an incumbent local exchange

"(1) Interconnection and network element charges

"Determinations by a State commission of the just and reasonable rate for the interconnection of facilities and equipment for purposes of subsection (c)(2) of section 251 of this title, and the just and reasonable rate for network elements for purposes of subsection (c)(3) of such section—

"(A) shall be—

"(i) based on the cost (determined without reference to a rate-of-return or other rate-based proceeding) of providing the interconnection or network element (whichever is applicable), and

"(ii) nondiscriminatory, and

"(B) may include a reasonable profit. . . ."

[7] See footnote 3 of this opinion for the text of § 16-247b (b).

[8] General Statutes § 16-1 (a) provides in relevant part: "Terms used in this title and in chapters 244, 244a, 244b, 245, 245a and 245b shall be construed as follows, unless another meaning is expressed or is clearly apparent from the language or context . . .

"(4) 'Public service company' includes electric, electric distribution, gas, telephone, telegraph, pipeline, sewage, water and community antenna television companies, owning, leasing, maintaining, operating, managing or controlling plants or parts of plants or equipment, and all express companies having special privileges on railroads within this state, but shall not include telegraph company functions concerning intrastate money order service, towns, cities, boroughs, any municipal corporation or department thereof, whether separately incorporated or not, a private power producer, as defined

carrier (incumbent carrier) in the state. State and federal law impose substantial obligations on the plaintiff as an incumbent carrier to share infrastructure facilities and wholesale services with competing carriers.

Prior to November, 1998, the plaintiff received requests from numerous competing carriers for certain service alternatives beyond those offered as part of the plaintiff's baseline ordering and provisioning processes. These services consisted of "pre due date service confirmation," "expedite service," "coordinated cutover service," and "out of hours service."[9] The plaintiff initially satisfied these requests on an ad hoc basis. In November, 1998, the plaintiff informed competing carriers that it was making the enhanced services generally available. Because the plaintiff considered these services enhancements to its baseline services, it determined that it could set the rates and conditions by which competing carriers could obtain these services, and,

_____

in section 16-243b, or an exempt wholesale generator, as defined in 15 USC 79z-5a . . . .

"(23) 'Telephone company' means a telecommunications company that provides one or more noncompetitive or emerging competitive services, as defined in section 16-247a . . . ."

[9] "Pre due date service confirmation" provides an assurance by the plaintiff that wholesale services ordered from it will be available on a specifically requested date. "Expedite service" allows a competing carrier to request the installation of certain regulated products or services at an earlier date than the plaintiff's standard due date. "Out of hours service" allows a competing carrier to request that the plaintiff install telephone services outside of its regular weekday business hours, so that a customer can get installation on a weekend or weeknight. "Coordinated cutover service" allows competing carriers to schedule installation or conversion of a regulated product or service at a specific time, rather than during the plaintiff's normally scheduled commitment window. This service permits a customer to remain in service or to minimize the out of service time period during the transition from one provider to another by coordinating the timing of disconnection with the installation of the new service. The plaintiff's baseline coordination installation process occurs at its discretion at any point during a two hour window and is available for conversion of unbundled loops only, whereas coordinated cutover service begins at the time specified by the competing carrier and may be applied to most wholesale local exchange services.

accordingly, executed with competing carriers desiring the services a memorandum of understanding reflecting those terms. The plaintiff charged the competing carriers the following nonrecurring charges for the services: $489.53 for pre due date confirmation; $656.73 for expedite service; $378 for out of hours service; and $394.85 for coordinated cutoff service. The plaintiff offered these enhanced services to its own retail customers at either no cost or on a time and materials basis.

MCI Worldcom, Inc. (MCI), a competing carrier, attempted unsuccessfully to negotiate, on behalf of its subsidiaries, alternative terms to those set forth in the plaintiff's memorandum of understanding for the enhanced services. As a result, in February, 1999, MCI filed a petition for a declaratory ruling with the department, requesting that the department assert jurisdiction over the nonrecurring charges assessed by the plaintiff for the enhanced services. Several other competing carriers filed petitions with the department in support of MCI's petition.[10] The competing carriers claimed that these services were necessary for the provision of telecommunications services and not mere enhancements to the plaintiff's baseline service, as the plaintiff had asserted. Accordingly, in the competing carriers' view, the rates for such services must be tariffed and approved by the department pursuant to its authority under § 16-247b (b), which authorizes the department to "determine the rates" for such "necessary" services.[11] See footnote 3 of this opinion. The competing carriers further contended that the rates that the plaintiff

[10] AT&T Communications of New England, CTC Communications Corporation, and Supra Telecommunications and Information Systems, Inc., supported MCI's petition.

[11] The record indicates that, although the primary thrust of the competing carriers' jurisdictional claim was predicated on § 16-247b (b), the competing carriers also cited, as a source of jurisdiction, General Statutes §§ 16-6b and 16-19, as well as §§ 16-1-53, 16-1-53a, 16-1-59A and 16-2-6 of the Regulations of Connecticut State Agencies.

charged for the services were excessive and not cost-based. They claimed that the plaintiff's actions impaired their ability to compete because the plaintiff had discriminated against them by providing the same services to its own customers at little or no cost. The competing carriers pointed to recent amendments to § 16-247b (b), claiming that those changes require the plaintiff to provide nondiscriminatory pricing for unbundled[12] network elements[13] "based on their respective forward-looking long-run incremental costs, consistent with the provisions of 47 U.S.C. § 252 (d) [Sup. 1999]."[14] See Public Acts 1999, No. 99-222. To remedy these concerns, the competing carriers requested, inter alia, that the department require the plaintiff to submit a tariff of rates, subject to the department's approval, along with a cost

___

[12] "Unbundling" is a term utilized in both state and federal telecommunications law, but it is not statutorily defined. In addressing the term's meaning, the United States Supreme Court noted that "[t]he dictionary definition of 'unbundle[d]' matches the [Federal Communications Commission's] interpretation of the word: 'to give separate prices for equipment and supporting services.' Webster's Ninth Collegiate Dictionary 1283 (1988)." *AT&T Corp.* v. *Iowa Utilities Board*, 525 U.S. 366, 394, 119 S. Ct. 721, 142 L. Ed. 2d 834 (1999). It has been uncontested from the commencement of these proceedings that the plaintiff offers its enhanced services as separately priced services and, accordingly, that these services are unbundled. The term's meaning is explained further in the context of our discussion of the statutory scheme in footnote 22 of this opinion.

[13] Connecticut incorporated by reference the federal definition of network elements as part of the 1999 amendments addressing telecommunications reform. See Public Acts 1999, No. 99-222. General Statutes § 16-247a (b) (7) provides: " 'Network elements' means 'network elements', as defined in 47 USC 153(a)(29)." That term is defined under the 1996 federal act as: "[A] facility or equipment used in the provision of a telecommunications service. Such term also includes features, functions, and capabilities that are provided by means of such facility or equipment, including subscriber numbers, databases, signaling systems, and information sufficient for billing and collection or used in the transmission, routing, or other provision of a telecommunications service." 47 U.S.C. § 153 (29) (Sup. 1999).

[14] See footnote 6 of this opinion for the text of 47 U.S.C. § 252 (d) (Sup. 1999).

study substantiating the rates that it charged for each enhanced service.[15]

In response to these claims, the plaintiff first contended that it had acted appropriately in all respects regarding its offering of the services pursuant to its memoranda of understanding and that its current rates were reasonable. Although the plaintiff conceded that it intended ultimately to file the executed agreements with the department, along with a cost study supporting its final rates, it contended that the department lacked jurisdiction over the enhanced services. Specifically, the plaintiff asserted that the only provisions under state and federal law that authorize the department to determine rates limit the exercise of that authority to claims implicating network elements or services that constitute necessary telecommunications services. Because, in the plaintiff's view, the enhanced services were neither necessary nor telecommunications services, the services fell beyond the department's purview. The plaintiff contended that, in the absence of such authority, it should be free to charge what the market for such services will bear. With respect to the claim of discriminatory treatment, the plaintiff asserted that its obligation not to discriminate meant only that it could not arbitrarily treat competing carriers differently, which it had not done.

---

[15] The competing carriers also had requested that the department require the plaintiff to amend its standard memorandum of understanding to reflect fairer terms. Specifically, the competing carriers had claimed that the plaintiff's memorandum contained no liability provision in the event that the plaintiff intentionally should fail to deliver promised services. One of the competing carriers further had requested that the plaintiff be required in its tariff to differentiate between resellers and facilities-based competing carriers. According to CTC Communications Corporation, the competing carrier making this request, as a reseller, it does "not own [its own] facilities, wires, switches or physical network. Resellers lease space on the [incumbent carrier]'s (the plaintiff's) physical network. Resellers merely provide customer service and billing functions to the end-user customer."

The department determined that the features and functions that constitute the enhanced services are not "essential" or "critical" services, but, rather, telecommunications services of a premium nature. Nonetheless, it concluded that the enhanced services were subject to the department's jurisdiction. The department reasoned that as both a public service company and a telephone company; see footnote 8 of this opinion; the plaintiff's services fall within its jurisdiction. It also noted the department's broad grant of statutory authority pursuant to § 16-247f (a) to "regulate the provision of telecommunications services in the state in a manner designed to foster competition and protect the public interest." The department further determined that § 16-247b (a); see footnote 3 of this opinion; both authorizes the department to determine which unbundled functions of a telecommunications company's network that are being used for telecommunications services are capable of being tariffed and bars the plaintiff from discriminating in providing those functions. Moreover, the department noted that it was vested with authority, pursuant to the 1996 federal act; 47 U.S.C. §§ 251, 252 (Sup. 1999); to ensure that all incumbent local exchange carrier interconnection and network element services are reasonable. Finally, the department noted that the plaintiff had proposed to file the executed agreements with the department, and that these arrangements were subject to the department's jurisdiction.

The department, therefore, addressed the merits of the competing carriers' claims. It agreed with the competing carriers that the plaintiff's rates were excessive. It noted that, in prior decisions, the department had determined that costs must be calculated based on a particular forward-looking methodology, total service

long run incremental cost (long run cost).[16] It also had determined previously that this methodology failed to account for certain costs that the plaintiff was entitled to recover and, accordingly, the plaintiff had been permitted to set rates based on a 25 percent level of contribution[17] to recover those costs. In light of those prior decisions, the department concluded that the plaintiff must propose rates calculated pursuant to the long run cost methodology plus a reasonable markup, which, in light of the fact that the enhanced services were not essential, could not exceed 25 percent. The department therefore ordered the plaintiff to submit a tariff for approval that satisfied these, as well as other,[18] conditions. The department further found that the plaintiff had discriminated by offering the enhanced services to its own retail customers at no cost or on a time and materials basis. It therefore ordered the plaintiff to impose the same charges contained in the tariff on its retail customers.

The plaintiff thereafter submitted proposed tariffs to the department. It also filed an appeal from the depart-

---

[16] See Application of the Southern New England Telephone Company for Approval to Offer Unbundled Loops, Ports and Associated Interconnection Arrangements, Dept. of Public Utility Control, Docket No. 95-06-17 (December 20, 1995) p. 11.

[17] The department has explained that "[c]ontribution represents nothing more than a monetary increment above the [long run cost] reflected in the margin for any given service." Application of the Southern New England Telephone Company for Approval to Offer Unbundled Loops, Ports and Associated Interconnection Arrangements, Dept. of Public Utility Control, Docket No. 95-06-17 (December 20, 1995) p. 11.

[18] The department also ordered the plaintiff to: (1) differentiate between facilities-based carriers and resellers when compiling cost studies and setting rates; (2) reimburse the competing carriers for the difference between the plaintiff's proposed tariffs and an interim tariff set by the department; and (3) include a remedy for wilful or intentional nonperformance or misconduct in the proposed tariff. The interim rates set by the department went into effect December 22, 1999, and were superseded by the plaintiff's proposed tariffs, which were approved on April 27, 2001.

ment's decision to the Superior Court,[19] pursuant to General Statutes § 4-183.[20] The plaintiff claimed that the department had exceeded its statutory authority pursuant to § 16-247b (b), which permits the department to determine rates for "telecommunications services . . . that are necessary for the provision of telecommunications," because the department had set rates for the enhanced services despite having concluded that those services were not necessary. The plaintiff further claimed that the department improperly had attempted to expand its authority by relying on other state and federal provisions that did not expressly authorize rate setting for services deemed to be not necessary. Moreover, the plaintiff claimed that the department could not exercise jurisdiction pursuant to § 16-247b (a) to prevent discriminatory conduct because the department had failed to satisfy a necessary predicate of that subsection by either not acting in the context of an unbundling proceeding or not making comparable findings to those made in an unbundling proceeding.

The trial court rejected the plaintiff's claims. The court first reasoned that the department had not exceeded its authority under § 16-247b (b) because it had not "set the rates" for the enhanced services. Instead, the trial court concluded, the department properly had exercised its authority pursuant to § 16-247b (a) to prohibit the plaintiff from discriminating in the rates it charged its own retail customers and the competing carriers. The trial court further reasoned that

[19] MCI, the competing carrier that had filed the petition challenging the plaintiff's charges, and CTC Communications Corporation, one of the competing carriers that had supported MCI's petition, filed motions to intervene as defendants in the appeal. The trial court granted the motions.

[20] General Statutes § 4-183 (a) provides in relevant part: "A person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision may appeal to the Superior Court as provided in this section. . . ."

§ 16-247b (a) does not require linguistically that services or functions be unbundled as a predicate to the department's exercise of jurisdiction to prevent discriminatory conduct and that, as a matter of common sense, an unbundling proceeding was not required when the plaintiff voluntarily had offered the services on an unbundled basis. Finally, the trial court noted the department's authority to prohibit discriminatory practices under § 16-247f (a) and 47 U.S.C. §§ 251 and 252 (Sup. 1999). See footnotes 5 and 6 of this opinion. Accordingly, the trial court dismissed the plaintiff's appeal. This appeal followed.

I

We first set forth the well established principles guiding our standard of review of the department's decision. "[A]n agency's factual and discretionary determinations are to be accorded considerable weight by the courts. . . . Cases that present pure questions of law, however, invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . We have determined, therefore, that the traditional deference accorded to an agency's interpretation of a statutory term is unwarranted when the construction of a statute . . . has not previously been subjected to judicial scrutiny [or to] . . . a governmental agency's time-tested interpretation . . . ." (Citations omitted; internal quotation marks omitted.) *Hartford* v. *Hartford Municipal Employees Assn.*, 259 Conn. 251, 261–62, 788 A.2d 60 (2002). The issues of whether the department properly had exercised jurisdiction over the competing carriers' claims that the plaintiff charged excessive and discriminatory rates and whether the department had exceeded its authority when it ordered the plaintiff to file a tariff that conformed with specific rate setting guidelines present questions of law. The department does not

claim that its interpretation of the statute is time-tested. Accordingly, we exercise plenary review over the plaintiff's claims.

"We approach this question according to well established principles of statutory construction designed to further our fundamental objective of ascertaining and giving effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, [and] to the legislative policy it was designed to implement . . . ." (Internal quotation marks omitted.) Id., 263.

Before addressing the merits of the plaintiff's claims, we note that this appeal requires us to navigate the murky waters of telecommunications regulatory reform, between the 1996 federal act, described as "in many important respects a model of ambiguity or indeed even self-contradiction"; *AT&T Corp.* v. *Iowa Utilities Board*, 525 U.S. 366, 397, 119 S. Ct. 721, 142 L. Ed. 2d 834 (1999); and the provisions enacted under Connecticut law prior to and in reaction to the 1996 federal act. We, therefore, preface our analysis with an overview of the development of telecommunications law relevant to the issue before us.

In 1993, the Connecticut legislature took the first steps to change an entrenched system in which a few telephone companies had state sanctioned monopolies over local exchange service; see General Statutes (Rev. to 1993) § 16-247b (a); by creating a task force to study ways to open the system to competition. See Public Acts 1993, No. 93-330, § 1. As an initial step toward the impending reforms, the legislature enacted a provision requiring the telephone companies to provide to its competitors "reasonable nondiscriminatory access to all equipment, facilities and services located within the state necessary to provide competitive or unregulated

telecommunications services to customers" and mandating that the department "determine the rates" for such necessary services. Public Act 93-330, § 2 (b). The following year, the legislature took the lead in the nation in local telephone service reform when it implemented the task force's recommendations. See Public Acts 1994, No. 94-83; see also 42 S. Proc., Pt. 7, 1999 Sess., p. 2476, remarks of Senator John Fonfara (calling Public Act 94-83 "landmark legislation"; noting that Connecticut was first state in country to pass deregulation of telecommunications industry). The goals of Public Act 94-83, referred to as the 1994 Telecommunications Act (state act), included ensuring access to high quality, affordable service and promoting competition as a means of ensuring a wide choice of customer services. See General Statutes § 16-247a (a) (1) and (2).[21] In order to achieve these goals, the state act emphasized the

---

[21] General Statutes § 16-247a (a) provides: "Due to the following: Affordable, high quality telecommunications services that meet the needs of individuals and businesses in the state are necessary and vital to the welfare and development of our society; the efficient provision of modern telecommunications services by multiple providers will promote economic development in the state; expanded employment opportunities for residents of the state in the provision of telecommunications services benefit the society and economy of the state; and advanced telecommunications services enhance the delivery of services by public and not-for-profit institutions, it is, therefore, the goal of the state to (1) ensure the universal availability and accessibility of high quality, affordable telecommunications services to all residents and businesses in the state, (2) promote the development of effective competition as a means of providing customers with the widest possible choice of services, (3) utilize forms of regulation commensurate with the level of competition in the relevant telecommunications service market, (4) facilitate the efficient development and deployment of an advanced telecommunications infrastructure, including open networks with maximum interoperability and interconnectivity, (5) encourage shared use of existing facilities and cooperative development of new facilities where legally possible, and technically and economically feasible, and (6) ensure that providers of telecommunications services in the state provide high quality customer service and high quality technical service. The department shall implement the provisions of this section, sections 16-1, 16-18a, 16-19, 16-19e, 16-22, 16-247b, 16-247c, 16-247e to 16-247i, inclusive, and 16-247k and subsection (e) of section 16-331 in accordance with these goals."

need to regulate commensurate with the level of competition and to encourage the shared use of the existing facilities belonging to the incumbent carriers. See General Statutes § 16-247a (a) (3) and (5). The state act mandated that the department "regulate the provision of telecommunications services in the state in a manner designed to foster competition and protect the public interest." General Statutes § 16-247f (a).

As part of its implementation of these goals, the state act included a provision giving the department the authority to initiate proceedings, either on petition or pursuant to its own motion, in which it could order the local telephone company to unbundle[22] certain functions of its network, if the department determined that the unbundled functions are "reasonably capable of being tariffed and offered as separate services. Such unbundled functions shall be offered under tariff at rates, terms, and conditions that do not unreasonably discriminate among . . . users and . . . providers of such local network services." Public Act 94-83, § 3 (a); see General Statutes (Rev. to 1995) § 16-247b (a).

Two years after Connecticut instituted local telephone reform, Congress enacted the 1996 federal act,

---

[22] The bill ultimately enacted as the state act explained that "[u]nbundling breaks the network into separate functions, such as call switching, to make it easier for telecommunication companies to compete with the local telephone company." House Bill No. 5420, 1994 Sess., p. 42. One court explained unbundling under the 1996 federal act as follows: "Unbundled access permit[s] new entrants to offer competing local services by purchasing from incumbents at cost-base prices, access to elements which they do not already possess, unbundled from those elements that they do not need. . . . To use a simple analogy, the unbundled access provision is akin to requiring one car manufacturer to sell a competitor access not to one of its completed vehicles, but to the individual elements of the vehicle, such as the engine, radiator, and tires, all of which the manufacturer has unbundled, or segregated out, for the competitor's convenience." (Citation omitted; internal quotation marks omitted.) *AT&T Communications of the Southern States, Inc.* v. *BellSouth Telecommunications, Inc.*, 268 F.3d 1294, 1297 (11th Cir. 2001).

which amended the Communications Act of 1934 that previously had been codified at 47 U.S.C. § 151 et seq. and instituted a comprehensive scheme, the goals of which were to end state sanctioned telephone monopolies and to open up competition across the country. See Pub. L. No. 104-104, 110 Stat. 56, codified at 47 U.S.C. §§ 151 through 276 (Sup. 1999); see also H.R. Rep. No. 104-204, reprinted in 1996 U.S.C.C.A.N. 10 (purpose of 1996 federal act is to "promot[e] competition and [reduce] regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid development of new telecommunications technologies"). The 1996 federal act prescribes a power sharing arrangement between the Federal Communications Commission (FCC) and the state commissioners. *MCI Worldcom Network Services, Inc.* v. *Federal Communications Commission*, 274 F.3d 542, 544 (D.C. Cir. 2001) (1996 federal act is "a kind of 'intergovernmental partnership' with a division of responsibility between the FCC and the states"); *Puerto Rico Telephone Co.* v. *Telecommunications Regulatory Board of Puerto Rico*, 189 F.3d 1, 8 (1st Cir. 1999) (1996 federal act is "exercise in . . . cooperative federalism"); see also *MCI Telecommunications Corp.* v. *U.S. West Communications*, 204 F.3d 1262, 1265 (9th Cir. 2000), cert. denied, 531 U.S. 1001, 121 S. Ct. 504, 148 L. Ed. 2d 473 (2001) (noting irony of "statute intended to promote competition [but that] creates two levels of regulatory control"). "The [FCC] is charged with the responsibility of promulgating regulations necessary to implement the [1996 federal act], but the [federal] [a]ct reserves to states the ability to impose additional requirements so long as the requirements are consistent with the [federal act] and 'further competition.' " *MCI Telecommunications Corp.* v. *U.S. West Communications*, supra, 1265; see 47 U.S.C. §§ 251 (d) (3) and 253; 47 C.F.R. § 51.317 (2001).

Like the Connecticut reform scheme, the 1996 federal act contains a provision to enable new market entrants to gain access to an incumbent carrier's facilities in order to offer competition in local telephone service. See 47 U.S.C. § 251 (Sup. 1999); see also H.R. Rep. No. 104-204, p. 47, reprinted in 1996 U.S.C.C.A.N. 10. Section 251 prescribes affirmative duties for incumbent carriers in order to ensure this access. Specifically, upon request by a competing carrier, an incumbent carrier is required to: sell local telephone services to competing carriers at wholesale rates for resale to end users (resale); interconnect the competing carriers' network with its own network (interconnection); and provide network elements to competing carriers on an unbundled basis (unbundled access). See 47 U.S.C. § 251 (c) (2) through (4) (Sup. 1999).

With respect to unbundled access, § 251 further prescribes that the incumbent carrier must provide such access to network elements "at any technically feasible point on rates, terms, and conditions that are just, reasonable, and nondiscriminatory . . . ." 47 U.S.C. § 251 (c) (3) (Sup. 1999). The scope of this duty is limited by § 251 (d), however, which requires the commissioner of the FCC to establish regulations to determine what network elements should be made available based on whether: "(A) access to such network elements as are proprietary in nature is *necessary*; and (B) the failure to provide access to such network elements would *impair* the ability of the telecommunications carrier seeking access to provide the services that it seeks to offer." (Emphasis added.) 47 U.S.C. § 251 (d) (2) (Sup. 1999); see also *AT&T Corp.* v. *Iowa Utilities Board,* supra, 525 U.S. 388–90 (vacating original FCC regulation that did not consider adequately whether elements met "necessary and impair" standard). Accordingly, the FCC has promulgated regulations elaborating on the meaning of the "necessary and impair" standard and setting forth

specific network elements that must be offered to competitors. 47 C.F.R. §§ 51.317, 51.319 (2001). The FCC regulations further provide that the state commissioners may require incumbent carriers, on a case-by-case basis, to provide unbundled access to additional network elements, so long as they adhere to the "necessary and impair" standard. 47 C.F.R. § 51.317 (2001).

Section 252 of title 47 of the United States Code sets forth the procedures by which competing carriers may request and obtain unbundled access to network elements, as well as interconnection and services. *AT&T Corp.* v. *Federal Communications Commission*, 220 F.3d 607, 611 (D.C. Cir. 2000). Unlike the state act, which envisioned resolution of such issues through an unbundling proceeding conducted by the department, the federal scheme emphasizes private, voluntary negotiation between the parties. See 47 U.S.C. § 252 (a) (Sup. 1999); see also L. Freedman & R. Davis, Negotiating Competition, 52 Admin. L. Rev. 999, 1003–1004 (Summer 2000) (describing negotiation process). Should such negotiations fail, a party may obtain binding arbitration by the state commissioner, at which time the commissioner may, inter alia, determine the "just and reasonable" and "nondiscriminatory" rates for the unbundled network element. 47 U.S.C. § 252 (b), (c), (d) (1) (Sup. 1999); see footnote 6 of this opinion. Such rates must be cost-based[23] and nondiscriminatory, and

---

[23] This particular provision has been the subject of ongoing litigation. The United States Court of Appeals for the Eighth Circuit originally ruled that the FCC lacked authority to issue pricing methodology regulations that are binding on the states. *Iowa Utilities Board* v. *Federal Communications Commission*, 120 F.3d 753, 793–94 (8th Cir. 1997). That decision was reversed by the Supreme Court in *AT&T Corp.* v. *Iowa Utilities Board*, supra, 525 U.S. 378–85. On remand, the Eighth Circuit determined that the FCC could prescribe the use of a forward-looking cost methodology under the 1996 federal act, but invalidated the FCC's specific methodology. *Iowa Utilities Board* v. *Federal Communications Commission*, 219 F.3d 744, 751–54 (8th Cir. 2000). An appeal from that Eighth Circuit's decision is now pending before the United States Supreme Court. *Verizon Communications,*

"may include a reasonable profit." 47 U.S.C. § 252 (d) (1) (B) (Sup. 1999).

Three years after the passage of the 1996 federal act, the Connecticut legislature enacted further changes to the state telecommunications scheme. See Public Acts 1999, No. 99-222. The changes expressly reflect a goal, in part, of conforming portions of the state law to the 1996 federal act.[24] Specifically, subsections (a) and (b) of § 16-247b, the state counterpart to federal provisions 47 U.S.C. §§ 251 and 252, were amended to incorporate references to the federal provisions.[25] See footnote 3 of this opinion. For the most part, however, the 1999 amendment did not result in creating a state scheme that precisely tracks the language of the federal provisions. Accordingly, we address the import of these changes and inconsistencies where relevant to our analysis of the issues before us.

## II

With the foregoing legal landscape in mind, we now address the plaintiff's claims. We begin with the plaintiff's challenges to the department's jurisdiction and authority under state law.

## A

The plaintiff first claims that the trial court improperly determined that the department properly had exercised jurisdiction, pursuant to §§ 16-247b (a) and 16-

Inc. v. Federal Communications Commission, 531 U.S. 1124, 121 S. Ct. 877, 148 L. Ed. 2d 788 (2001) (granting certification).

[24] See footnote 13 of this opinion for an example of how the 1999 amendment reflects the legislature's intent to incorporate federal law; see also 42 H.R. Proc., Pt. 16, 1999 Sess., pp. 5789–90, remarks of Representative Kevin M. DelGobbo.

[25] Although § 16-247b (a) does not refer expressly to §§ 251 and 252 of title 47 of the United States Code, that section does require that unbundling proceedings be "consistent with federal law," which implicitly refers to the unbundling requirements in those provisions of the federal law.

247f (a), over the rates the plaintiff charged for the enhanced services when adjudicating the competing carriers' claims that the plaintiff was charging them excessive and discriminatory rates for the services. At the heart of the plaintiff's claim is its contention that § 16-247b (b) is the only source of jurisdiction for rate setting and that this provision limits such authority to necessary telecommunications services. Because the department determined that the services are not essential—a finding the trial court equated with not necessary—the plaintiff claims that the department lacks jurisdiction under § 16-247b (b) and, accordingly, cannot assert jurisdiction pursuant to other statutes that do not expressly confer authority to set rates. We disagree.

The principles of subject matter jurisdiction are well established. "Jurisdiction of the subject-matter is the power [of the court] to hear and determine cases of the general class to which the proceedings in question belong. . . . A court has subject matter jurisdiction if it has the authority to adjudicate a particular type of legal controversy. . . . It is a familiar principle that a court which exercises a limited and statutory jurisdiction is without jurisdiction to act unless it does so under the precise circumstances and in the manner particularly prescribed by the enabling legislation." (Internal quotation marks omitted.) *Federal Deposit Ins. Corp.* v. *Crystal*, 251 Conn. 748, 763, 741 A.2d 956 (1999).

"This concept, however, is not limited to courts. Administrative agencies [such as the department] are tribunals of limited jurisdiction and their jurisdiction is dependent entirely upon the validity of the statutes vesting them with power and they cannot confer jurisdiction upon themselves. . . . We have recognized that [i]t is clear that an administrative body must act strictly within its statutory authority, within constitutional limitations and in a lawful manner. . . . It cannot modify, abridge or otherwise change the statutory provisions,

under which it acquires authority unless the statutes expressly grant it that power." (Internal quotation marks omitted.) *Figueroa* v. *C & S Ball Bearing*, 237 Conn. 1, 4, 675 A.2d 845 (1996).

As noted previously, when enacting the broad regulatory reforms over local telephone service in 1994, the Connecticut legislature set forth specific goals, among them to "ensure . . . accessibility of high quality, affordable telecommunications services to all residents and businesses in the state" and to "promote the development of effective competition . . . ." Public Act 94-83, § 2 (a); see General Statutes § 16-247a (a) (1) and (2). The legislature then mandated that the department implement various provisions of the state act, including §§ 16-247f and 16-247b, "in accordance with these goals." Public Act 94-83, § 2 (a); General Statutes § 16-247a (a).

The legislature conferred a broad grant of authority upon the department in § 16-247f (a), requiring it to "regulate the provision of telecommunications services . . . in a manner designed to foster competition and protect the public interest." The competing carriers had claimed that the plaintiff was charging excessive rates for the enhanced provisioning services and that the plaintiff had charged either a minimal fee or no fee to its own customers. The competing carriers further claimed that they would be unable to compete in giving customers desired services if they were forced to pay the inflated rates that the plaintiff sought to impose. It is evident, therefore, that that these claims fall within the department's purview of regulating to foster effective competition and to protect the public's interest in affordable telephone services.

The plaintiff claims that the more specific grant of jurisdiction to the department to set rates for necessary services in § 16-247b (b) requires us to apply the maxim

of statutory construction that "specific terms covering the given subject matter will prevail over general language of the same or another statute which might otherwise prove controlling." (Internal quotation marks omitted.) *In re Darlene C.*, 247 Conn. 1, 14, 717 A.2d 1242 (1998). We disagree with the plaintiff's premise that the legislature had evinced an intention by its express grant of authority under § 16-247b (b) to limit its otherwise broad grant of regulatory authority to the department under §§ 16-247a and 16-247f.

The United States Supreme Court's decision in *AT&T Corp.* v. *Iowa Utilities Board,* supra, 525 U.S. 366, informs our reasoning on this question. One of the issues before the court in that case was whether the commissioner of the FCC had jurisdiction pursuant to the 1996 federal act to promulgate regulations prescribing a cost methodology that was binding on the states when determining rates. Id., 374. The court determined that the FCC did have jurisdiction, relying on 47 U.S.C. § 201 (b), which provides in relevant part: "The [FCC] may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter." The court reasoned that the broad grant of jurisdiction under § 201 *"explicitly* gives the FCC jurisdiction to make rules governing matters to which the [1996 federal act] applies." (Emphasis in original.) *AT&T Corp.* v. *Iowa Utilities Board,* supra, 380. The incumbent carriers challenging the regulations had contended that specific language in 47 U.S.C. § 252 (c) (Sup. 1999) authorizing the state commissioners to "establish any rates" entrusted jurisdiction over establishing rates to those commissioners. *AT&T Corp.* v. *Iowa Utilities Board,* supra, 383–84. The court rejected that contention, reasoning that the state commissioners' application of the prescribed cost methodology to determine a concrete result was sufficient to constitute establishing rates. Id., 384. More important for our pur-

poses, the court also rejected the incumbent carriers' contention that, because the FCC was mandated to promulgate regulations in one provision of § 252 (c) that was unrelated to rates, it thereby was precluded from promulgating regulations pursuant to the subsection addressing rates, which contained no express grant of authority to the FCC. Id., 384–85. The incumbent carriers had contended that the absence of an express grant of jurisdiction evinced Congress' intention to limit the FCC's otherwise broad grant of authority to regulate under § 201 (b). Id., 384. The Supreme Court explained in rejecting that contention: "It seems to us not peculiar that the mandated regulations should be specifically referenced, whereas regulations permitted pursuant to the [FCC's] § 201 (b) authority are not. In any event, the mere lack of parallelism is surely not enough to displace that explicit authority." Id., 385.

Our state scheme contains a broad grant of authority to the department to protect the public interest similar to that afforded to the FCC under the 1996 federal act. See General Statutes § 16-247f (a); see also General Statutes § 16-247a. The plaintiff has provided no evidence that the legislature's specific mandate that the department *must* determine the rates for necessary telecommunications services displaces the department's jurisdiction with respect to services that are not necessary in the strict technical sense applied by the department under § 16-247b (b), but that are needed nonetheless in order to compete effectively. Indeed, we find neither limiting language in the statute nor any legislative history demonstrating such an intention. Cf. *Gifford* v. *Freedom of Information Commission*, 227 Conn. 641, 658–61, 631 A.2d 252 (1993) (noting language in statute limiting broader term and legislative history that evinced intention to make such limitation). Accordingly, we conclude that the legislature's specific grant of jurisdiction to the department under § 16-247b (b)

does not limit or negate its broad jurisdictional grant to the department pursuant to §§ 16-247a and 16-247f.

Furthermore, § 16-247b (a) *expressly* prohibits the discriminatory practice in which the plaintiff was alleged to have been engaged. That section provides in relevant part: "Any telecommunications services, functions and unbundled network elements and any combination thereof *shall be offered under tariff at rates, terms and conditions that do not unreasonably discriminate* among actual and potential users and actual and potential providers of such local network services." (Emphasis added.) General Statutes § 16-247b (a). We point out that this prohibition is in addition to a similar ban on discriminatory conduct contained in subsection (b) of § 16-247b. See footnote 3 of this opinion. This dual prohibition evinces legislative intent to prohibit discriminatory conduct both with respect to necessary services, pursuant to subsection (b), and with respect to services that are deemed not necessary, pursuant to subsection (a). To read the parallel provisions otherwise would render the prohibition in subsection (a) superfluous, and, accordingly, we reject such an interpretation. See *State* v. *Gibbs*, 254 Conn. 578, 602, 758 A.2d 327 (2000) ("It is a basic tenet of statutory construction that the legislature did not intend to enact meaningless provisions. . . . [S]tatutes must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant . . . ." [Internal quotation marks omitted.]). The prohibition on discriminatory conduct in § 16-247b (a), therefore, provides the department with specific "authority to adjudicate [the] particular type of legal controversy" raised by the competing carriers' petition. *Federal Deposit Ins. Corp.* v. *Crystal*, supra, 251 Conn. 763.

We conclude that the competing carriers' claims raised issues of whether the plaintiff's conduct, with respect to its offering of the enhanced services, was

discriminatory and contrary to the goals of the state act of providing affordable telephone service, promoting competition and protecting the public interest. Accordingly, the trial court properly determined that the department had subject matter jurisdiction over the claims under state law. See General Statutes §§ 16-247a, 16-247b (a) and 16-247f (a).

B

The plaintiff next claims that the trial court improperly determined that the department had the authority, pursuant to §§ 16-247b (a) and 16-247f (a), to order the plaintiff to submit a tariff, subject to the department's approval, that satisfied specific criteria. The plaintiff offers two arguments in support of this claim. First, the department failed to conduct an unbundling proceeding, which, in the plaintiff's view, is a necessary predicate to the department's exercise of authority under § 16-247b (a). Second, the plaintiff claims that, even if the department had jurisdiction over the competing carriers' claims pursuant to § 16-247b (a), the department's authority under that section is limited to preventing the discriminatory application of rates, and does not extend to setting rates. We reject both of these arguments.

The plaintiff had raised, in its brief, the issue of whether an unbundling proceeding, as provided for in the first sentence in § 16-247b (a); see footnote 3 of this opinion; is a necessary predicate to the department's exercise of authority over discrimination claims under that section. At oral argument, however, the plaintiff agreed with the department's position that it voluntarily had offered the enhanced services on an unbundled basis. The plaintiff then conceded that, as a result, there was "no need" for an unbundling proceeding.[26] Accord-

---

[26] At oral argument before this court, the plaintiff's counsel stated: "Everyone agrees there was no petition to unbundle. There was no motion by the [department] to unbundle; there was no proceeding to unbundle; there was no need to unbundle. There was no proceeding as contemplated by [§ 16-

ingly, in the plaintiff's view, because there had been no unbundling proceeding, a proceeding that it concedes was unnecessary, the department could not exercise its authority pursuant to the second sentence in § 16-247b (a) to prevent unreasonable discrimination.

We reject this position, in part, because it "would require a circular course of reasoning in which we are unprepared to indulge." *In re Jonathan M.*, 255 Conn. 208, 223, 764 A.2d 739 (2001). In addition, if we were to accept the plaintiff's premise, an incumbent carrier could circumvent the department's authority under § 16-247b (a) to prevent unreasonable discrimination any time it chose to by voluntarily offering the services on an unbundled basis. Such an interpretation of the statute clearly runs counter to the legislature's intent and we, therefore, reject it. See *Southington* v. *Commercial Union Ins. Co.*, 254 Conn. 348, 358, 757 A.2d 549 (2000) ("we read each statute in a manner that will not thwart its intended purpose or lead to absurd results" [internal quotation marks omitted]).

Finally, we interpret the plaintiff's position that there was no need for an unbundling proceeding as a waiver

247b (a)] in which the [department] could exercise jurisdiction [under the second sentence of that section]." The following exchange then took place during the plaintiff's rebuttal argument:

"Justice Vertefeuille: What is your response to the department's contention that the phone company unbundled the services on its own by offering them pursuant to a memorandum of understanding at prices that were provided for in that memorandum?

"Plaintiff's Counsel: I think that they're right that we already did this, that we did it on our own. But keep in mind, that even the [department] recognizes and has said that what we're talking about here are not unbundled network elements. These are extra, I think the [department] said, premium services. So whether we unbundle them or not, affects only one thing—it affects whether there was a need for an unbundling proceeding under the first sentence of § 16-247b (a). Obviously, there was no need for such a proceeding; therefore, there was no such proceeding. And because there was no such proceeding, the second sentence of that section does not come into play and does not afford the [department] the jurisdiction that it claims based on that second sentence."

of a claim that it is entitled to such a proceeding. See *Habetz* v. *Condon*, 224 Conn. 231, 233 n.3, 618 A.2d 501 (1992) (plaintiff's claim raised in brief but abandoned at oral argument considered waived); *Bowman* v. *1477 Central Avenue Apartments, Inc.*, 203 Conn. 246, 255 n.8, 524 A.2d 610 (1987) (same). This waiver eliminates, therefore, our need to determine whether the department is required under § 16-247b (a) to conduct an unbundling proceeding, making the requisite findings (i.e., that unbundling is in the public interest, consistent with federal law), in order to exercise its authority under the second sentence of that section to prevent unreasonable discrimination.

The plaintiff next contends that, even if the department has the authority to prevent unreasonable discrimination under § 16-247b (a) in the absence of an unbundling proceeding, that authority is limited to ordering the plaintiff not to discriminate and does not extend to setting rates. The plaintiff contends that the department did in fact set rates in its decision by prescribing a specific cost methodology that it must utilize and by determining the maximum markup it may charge. Accordingly, in the plaintiff's view, the department exceeded its authority under § 16-247b (b), which authorizes the department to determine the rates only for necessary telecommunications services. Because we have determined in part II A of this opinion that the specific grant of jurisdiction in § 16-247b (b) does not otherwise constrain the department's jurisdiction, however, the issue is not whether the department did or did not determine rates in its decision. The issue is whether the department's action was in excess of its statutory authority pursuant to §§ 16-247b (a), 16-247a and 16-247f (a).

We begin with § 16-247b (a), which provides in relevant part: "Any telecommunications services, functions and unbundled network elements and any combination

thereof shall be offered under tariff at rates, terms and conditions that do not unreasonably discriminate among actual and potential users and actual and potential providers of such local network services." The requirement that telecommunications services be "offered under tariff" logically leads to the conclusion that the department has the authority to order the plaintiff to file a tariff for the services in order to ensure that the plaintiff is not discriminating in its provision of the services. Cf. General Statutes § 16-247f (referring to tariff investigations by department and tariff filings); Regs., Conn. State Agencies § 16-1-59A (prescribing procedures for "tariff filings by telephone companies [that] do not alter existing rates or charges"). Moreover, this provision does not proscribe all discriminatory conduct but only *unreasonable* discrimination. Therefore, the department may do more than what the plaintiff suggested in oral argument before this court, which was simply to order the plaintiff not to discriminate. It is within the scope of the department's authority to prescribe a cost methodology from which it may determine, based upon neutral criteria, whether any variation in rates the plaintiff charges to various competing carriers and its customers is a reasonable, cost-based distinction or simply discrimination unconnected to any rationale. We conclude, however, that the scope of the department's authority under § 16-247b (a) to prevent unreasonable discrimination does not extend to prescribing the maximum markup an incumbent carrier may take on services. Accordingly, we now turn to §§ 16-247a and 16-247f (a) to determine whether those provisions provide the department with such authority.

Section 16-247f (a) requires the department to "regulate the provision of telecommunications services in the state in a manner designed to foster competition and protect the public interest." One aspect of the public's interest, as set forth in § 16-247a, is in high quality,

affordable telephone service. In light of the remedial purposes of the statute, we read this authority broadly so as to effectuate the legislature's intent. See *Ganim* v. *Smith & Wesson Corp.*, 258 Conn. 313, 373, 780 A.2d 98 (2001) (Connecticut Unfair Trade Practices Act is "remedial statute that must be accorded a liberal interpretation in favor of those whom the legislature intended to benefit"); *BEC Corp.* v. *Dept. of Environmental Protection*, 256 Conn. 602, 621–22, 775 A.2d 928 (2001) ("conclusion that the individual plaintiffs personally are liable under [General Statutes] § 22a-432 is supported by the broad remedial purpose of the [Environmental Protection Act], which is to protect the waters of the state from pollution"); *Hartford Electric Supply Co.* v. *Allen-Bradley Co.*, 250 Conn. 334, 345, 736 A.2d 824 (1999) (Connecticut "[F]ranchise [A]ct's remedial purpose, to prevent a franchisor from unfairly exerting economic leverage over a franchisee, indicates that the statute should be read broadly in favor of the plaintiff"). Moreover, "the legislature's broad grant of power may be interpreted to include the conferral of such lesser included powers as are necessary to fulfill a legislative mandate." (Internal quotation marks omitted.) *Nelseco Navigation Co.* v. *Dept. of Liquor Control*, 226 Conn. 418, 424, 627 A.2d 939 (1993); see also *Greenwich* v. *Dept. of Public Utility Control*, 219 Conn. 121, 126, 592 A.2d 372 (1991) (department has authority to equalize rates, despite no express authority, in light of "remedial purpose" of statute and "evident legislative intent to rely on the [department's] expertise"); *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, 219 Conn. 51, 64, 591 A.2d 1231 (1991) (General Statutes § 16-19e creates "broad grant of regulatory authority [to the department that] carries with it the necessarily equally broad discretion, to be exercised within legal limits"). We conclude, therefore, that the department's authority, pursuant to § 16-247f (a) and

its concomitant authority pursuant to § 16-247a, encompasses the power to set limits on the maximum markup an incumbent carrier may charge for services when that carrier has charged excessive rates for services contrary to the public interest.[27] Accordingly, the trial court properly determined that the department did not exceed its statutory authority by ordering the plaintiff to file a tariff subject to the department's approval that met specific criteria.

We note that, in the present case, the plaintiff has not claimed that the department's findings and conclusions,

---

[27] We note that, in oral argument before this court, the plaintiff conceded that the department has the authority under § 16-247f (a) to prevent discriminatory conduct. Indeed, the plaintiff's counsel, in response to questions from Justice Palmer, indicated that, if the plaintiff were to continue to engage in discriminatory conduct, the department would have the authority to take other measures. The following colloquy occurred:

"Justice Palmer: What basis would [the department] have to tell you not to discriminate in this proceeding? What would be their authority to do that? Their general authority—their anti-discrimination authority?

"Plaintiff's Counsel: The statute under which they purported to operate, a statute, is § 16-247f (a). (Reads text of statute.)

"Justice Palmer: And in your view, it would have been appropriate for them to invoke that statute in this proceeding and directed you not to discriminate?

"Plaintiff's Counsel: They could have said, 'Do not discriminate.' And if they said do not discriminate without setting the rates, of course we wouldn't discriminate. . . . But we also could have dropped the services. . . .

"Justice Palmer: And if you persisted in discriminating, what would be the remedy to the [department]?

"Plaintiff's Counsel: I suspect that the [department] then would lodge a complaint and hold a hearing . . . on whether we had discriminated and would invoke an appropriate statute, which it said, I believe, was § 16-247f (a), and say that 'we declare under that statute that you shouldn't discriminate, we find that you are discriminating, and we're going to enforce.' But what the limits of that enforcement are is the discrimination."

We note that the department could have limited its decision to ordering the plaintiff not to discriminate with regard to the rates it charges, pursuant to its authority under § 16-247b (a), withholding any further action to see whether the plaintiff thereafter reduced its rates to a reasonable level. Indeed, we believe that result would have been likely in light of the fact that the plaintiff was ordered to charge its own retail customers the same rates it charged the competing carriers. Nonetheless, the department was not precluded from taking further action based upon its determination that

pursuant to its authority to regulate to prevent unreasonable discrimination, foster competition and protect the public interest, were unsupported by substantial evidence or were an abuse of the department's discretion. We therefore do not address this issue. We feel compelled, however, after our review of the department's decision in this case and of prior decisions offered by the department in support of this appeal, to caution the department that, in our view, it has failed to apply the necessary precision in its decisions. For example, the department determined in the present case that the plaintiff's enhanced services are not "critical" or "essential" services. The relevant determination, pursuant to § 16-247b (b), however, is whether the services are "necessary."[28] Moreover, the department's findings of fact did not include a finding that the plaintiff had, in fact, unreasonably discriminated or a finding that the public interest or competition had been impaired by the plaintiff's actions, thus warranting the department's intervention.[29] Accordingly, we caution the department that, in future proceedings, it should set forth expressly the statutory provision upon which

the plaintiff had charged excessive rates in order to avoid the potential for future litigation.

[28] Moreover, our review of the department's decisions disclose numerous instances in which it has cited generally § 16-247b as the basis for its authority without expressly invoking the relevant subsection at issue. See, e.g., Application of the Southern New England Telephone Company for Approval of Total Service Long Run Incremental Cost Studies and Rates for Unbundled Elements, Dept. of Public Utility Control, Docket No. 97-04-10 (May 20, 1998) pp. 43–44; Application of the Southern New England Telephone Company for Approval to Offer Interconnection Services and Other Related Items Associated with the Company's Local Exchange Tariff, Dept. of Public Utility Control, Docket No. 95-11-08 (July, 17, 1996) pp. 48–49; Application of the Southern New England Telephone Company for Approval to Offer Unbundled Loops, Ports and Associated Interconnection Arrangements, Dept. of Public Utility Control, Docket No. 95-06-17 (December 20, 1995) p. 71.

[29] The department did state, in its analysis of the competing carriers' claims that the plaintiff's charges for the enhanced services are excessive and discriminatory, that the "[competing carriers'] points are well taken."

it relies to exercise jurisdiction and that it should articulate specific findings of fact and conclusions of law consistent with the statutory requirements in support of its exercise of authority.

### III

Finally, we address the issue of whether the trial court properly concluded that the department had jurisdiction over the competing carriers' claims under federal law, pursuant to 47 U.S.C. §§ 251 (c) (3) and 252 (d), and, accordingly, did not exceed its authority when it ordered the plaintiff to file a tariff that satisfied specific rate setting criteria. The trial court had noted that § 251 (c) (3) requires incumbent carriers to provide "nondiscriminatory access to network elements on an unbundled basis . . . on rates, terms, and conditions that are just, reasonable, and nondiscriminatory in accordance with the terms and conditions of the agreement and the requirements of this section and section 252 of this title." 47 U.S.C. § 251 (c) (3) (Sup. 1999). The court further had noted that § 252 mandates that rate determinations by state commissioners for network elements for purposes of § 251 (c) (3) must be nondiscriminatory. 47 U.S.C. § 252 (d) (1) (A) (ii) (Sup. 1999).

The plaintiff claims that the enhanced services are not subject to regulation under federal law because its obligations under § 251 (c) (3) are triggered only when the network elements to which unbundled access is sought satisfies the "necessary and impair" standard under § 251 (d) (2). Because the department determined that the plaintiff's enhanced services were not necessary services,[30] the plaintiff contends that §§ 251 (c) (3)

[30] It appears from the department's decision and its argument before this court that it has interpreted the term "necessary," as used in § 16-247b (b), to mean critical or essential for the provision of basic telephone service. This interpretation seems somewhat narrower than what would satisfy the "necessary and impair" standard under federal law. See 47 C.F.R. § 51.317 (a) (2) (iii) (providing authority to FCC and state commissions to order

and 252 (d) (1) are inapplicable and, therefore, cannot provide a basis for the department's jurisdiction. The plaintiff's claim in this regard is similar to the one it proffered regarding state law—that the department may set rates only when necessary services are at issue.

Conversely, the department claims that 47 U.S.C. § 251 (d) applies only insofar as to dictate the circumstances under which an incumbent carrier may be required to provide unbundled access to network elements. It does not limit the incumbent carrier's duty under § 251 (c) to provide reasonable and nondiscriminatory rates, in the department's view, when, as in the present case, the incumbent voluntarily has unbundled the network elements.

Both parties have articulated plausible interpretations of § 251 (c) (3). See *AT&T Corp.* v. *Iowa Utilities Board*, supra, 525 U.S. 397 (1996 federal act is "in many important respects a model of ambiguity or indeed even self-contradiction"). In light of our conclusion that the department properly exercised its jurisdiction and authority under state law, however, we need not resolve this question. *Roth* v. *Weston*, 259 Conn. 202, 205 n.2, 789 A.2d 431 (2002) (court does not decide issues unnecessary to resolution of case); *Bortner* v. *Woodbridge*, 250 Conn. 241, 251 n.13, 736 A.2d 104 (1999) (same). We nevertheless consider whether the department's exercise of jurisdiction and authority pursuant to state law is consistent with the federal scheme. We address this issue because the state scheme expressly references the 1996 federal act; see footnotes 3 and 13 of this

unbundling pursuant to "necessary and impair" standard under 47 U.S.C. § 251 (d) if, inter alia, "[l]ack of access to such element would jeopardize the goals of the 1996 [federal] [a]ct"). Although we address in part III of this opinion the issue of whether the department's exercise of jurisdiction and authority under state law is consistent with the federal scheme, we need not determine at this time whether the standards are indeed different because the department's jurisdiction was not premised on § 16-247b (b).

opinion; thereby indicating the legislature's intention to reconcile the schemes. Moreover, this discussion provides further evidence in support of our analysis in part II of this opinion.

As we have noted previously, the 1996 federal act created a two tier scheme of regulation, with power shared between the FCC and the state commissioners. The 1996 federal act reflects a "general policy . . . of recognizing state authority over certain aspects of local telecommunications—in areas over which the states held virtually exclusive sway prior to the enactment of the [1996 federal act]—while ensuring compliance with federal law. [It] exemplifies a cooperative federalism system, in which state commissions can exercise their expertise about the needs of the local market and local consumers, but are guided by the provisions of the [1996 federal act] and by the concomitant FCC regulations . . . ." (Citation omitted.) *Puerto Rico Telephone Co.* v. *Telecommunications Regulatory Board of Puerto Rico*, supra, 189 F.3d 14.

"Congress intended to divide responsibility, and unless it expressly provided for federal responsibility, it left pre-1996 [federal act] assignments of responsibility in place, such as by retaining [47 U.S.C.] §§ 152 and 410. In [47 U.S.C.] § 601 (c) (1) of the 1996 [federal act], Congress makes this point explicit: 'This Act and the amendments made by [it] shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or amendments.' Pub. L. No. 104-104, 110 Stat. 56, 143 (1996) (codified at 47 U.S.C. § 152 note) . . . ." *Bell Atlantic Maryland, Inc.* v. *MCI Worldcom, Inc.*, 240 F.3d 279, 300–301 (4th Cir. 2001); see also 47 U.S.C. § 253 (b) (Sup. 1999) ("[n]othing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this title, requirements necessary to . . . ensure the continued

quality of telecommunications services, and safeguard the rights of consumers").

The state commissioners' authority to order incumbent carriers to provide *access* to network elements on an unbundled basis under § 251 (c) (3) is expressly limited by § 251 (d) (3). They cannot order incumbents to provide unbundled access to unnecessary services; they only may order incumbent carriers to provide unbundled access if the competing carrier's request for access satisfies the necessary and impair standard. See also 47 C.F.R. § 51.317 (b) (4). There is no express limitation in § 251, however, on an incumbent carrier's duty to provide reasonable and nondiscriminatory rates. Even if we assume that § 251 cannot be construed to *authorize* the department to ensure reasonable and nondiscriminatory rates for network elements that are not necessary, there clearly is no language that expressly *prohibits* any action with respect to those elements. Indeed, under the plaintiff's view, § 251 (c) simply does not apply to services that are not necessary. Accordingly, we find nothing in the express language of the 1996 federal act that would preclude the department from regulating under state law in the present case to protect the public's interest in affordable, high quality telecommunications service.

Moreover, the department's exercise of its authority under state law is consistent with the goal of the 1996 federal act to promote competition. See H.R. Rep. No. 104-204, p. 47 (1995), reprinted in 1996 U.S.C.C.A.N. 10, 11. Although we acknowledge that an additional goal of the 1996 federal act was to reduce regulation, we note that regulation, under that act, was associated with the protective measures taken by the states to perpetuate the incumbent carriers' monopoly over telephone service. See H.R. Rep. No. 104-204, p. 47 (1995),

reprinted in 1996 U.S.C.C.A.N. 10, 13.[31] We conclude, therefore, that the department's jurisdiction over the plaintiff's enhanced services pursuant to state law and its concomitant exercise of authority was not inconsistent with federal law.

The judgment is affirmed.

In this opinion the other justices concurred.

---

[31] The House Report provided: "In providing local phone service, telephone companies have historically been protected from competition by State and local government barriers to entry. The [local exchange carriers] are subject to extensive State government regulation of their business charges and practices. Customers receive an array of local services at prices influenced heavily by regulatory policies." H.R. Rep. No. 104-204, p. 47 (1995), reprinted in 1996 U.S.C.C.A.N. 10, 13.